1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

12
13
14
15
16
17
18
19
20

MAKAH INDIAN TRIBE,

        Plaintiff,

   v.

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION, BP
P.L.C., BP AMERICA INC., CHEVRON
CORPORATION, CHEVRON U.S.A. INC.,
SHELL PLC, SHELL OIL COMPANY,
CONOCOPHILLIPS, CONOCOPHILLIPS
COMPANY, PHILLIPS 66, and PHILLIPS 66
COMPANY,

        Defendants.

Case No.  2:24-cv-00157

DECLARATION OF JOSHUA D. DICK IN
SUPPORT OF NOTICE OF REMOVAL BY
DEFENDANTS CHEVRON CORPORA-
TION AND CHEVRON U.S.A. INC.

[Removal from the Superior Court of the
State of Washington, King County,
Cause No. 23-2-25216-1 SEA]

Action Filed: February 6, 2024

21
22
23
24
25
26
27
28

DECLARATION OF JOSHUA D. DICK IN
SUPPORT OF NOTICE OF REMOVAL

I, Joshua D. Dick, declare as follows:

1.      I am an attorney admitted to practice in the State of California, and my application for admission *pro hac vice* before this Court is forthcoming.  I am a partner in the law firm of Gibson, Dunn & Crutcher, LLP, and I am one of the attorneys responsible for the representation of Defendants Chevron Corporation and Chevron U.S.A. Inc. (together "the Chevron Parties") in this matter.  I make this declaration in support of the Chevron Parties' Notice of Removal, filed concurrently herewith.

2.      Unless otherwise stated, the following facts are within my personal knowledge through personal review of the documents and information described herein or through information gathered and provided to me by individuals at my firm, at my direction.  If called and sworn as a witness, I could and would testify competently thereto.

3.      I have consulted with my clients, and I have been informed that Chevron U.S.A. Inc. was served on January 17, 2024 by Plaintiff Makah Indian Tribe with a copy of the Complaint filed in the Superior Court of the State of Washington in and for King County on December 20, 2023.  The Notice of Removal is being filed not more than thirty (30) days after Chevron U.S.A. Inc. was served with a copy of the initial pleading setting forth the claims for relief upon which this action is based.  28 U.S.C § 1446(b).

4.      "[A] defendants who have been properly joined and served" consent to the removal of this action.  28 U.S.C. § 1446(b)(2)(A).  Such consents were provided to counsel for the Chevron Parties in correspondence with the other served Defendants and/or their counsel.

5.      Pursuant to 28 U.S.C § 1446(a), attached hereto as **Exhibit 1** are copies of all process, pleadings, and orders from the state-court action being removed to this Court that the Chevron Parties have been able to obtain from the Superior Court which are in the possession of the Chevron Parties.  Pursuant to 28 U.S.C § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by the Chevron Parties in the action.

NOTICE OF REMOVAL

1

6. Attached hereto as **Exhibit 2** is a true and correct copy of a news article published on the website of the *Seattle Times* on December 21, 2023, titled "Two PNW tribal nations sue oil companies over costs of climate change."

7. Attached hereto as **Exhibit 3** is a true and correct copy of the Treaty of Neah Bay between the United States and the Makah, 12 Stat. 939 (1855).

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct and that I executed this Declaration on February 6, 2024, at San Francisco, California.

*/s/ Joshua D. Dick*
Joshua D. Dick

NOTICE OF REMOVAL

2

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

# EXHIBIT 1

1
2
3
4
5
6
7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

8  MAKAH INDIAN TRIBE,

9                              Plaintiff,

10        v.

11  EXXON MOBIL CORPORATION,
    EXXONMOBIL OIL CORPORATION, BP
12  P.L.C., BP AMERICA INC., CHEVRON
    CORPORATION, CHEVRON USA, INC.,
13  SHELL PLC, SHELL OIL COMPANY,
    CONOCOPHILLIPS, CONOCOPHILLIPS
14  COMPANY, PHILLIPS 66, and PHILLIPS 66
    COMPANY,
15
16                             Defendants.

No.  23-2-25216-1 SEA

**SUMMONS**

17        **TO**:        EXXON MOBIL CORPORATION;
18        **AND TO**:    EXXONMOBIL OIL CORPORATION,;
          **AND TO**:    BP P.L.C.;
19        **AND TO**:    BP AMERICA INC.;
          **AND TO**:    CHEVRON CORPORATION;
20        **AND TO**:    CHEVRON USA, INC.;
          **AND TO**:    SHELL PLC;
21        **AND TO**:    SHELL OIL COMPANY;
          **AND TO**:    CONOCOPHILLIPS;
22        **AND TO**:    CONOCOPHILLIPS COMPANY;
23        **AND TO**:    PHILLIPS 66;
          **AND TO**:    PHILLIPS 66 COMPANY.
24
25
26

SUMMONS
PAGE - 1

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH. SUITE 304
SEATTLE. WASHINGTON  98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

4

A lawsuit has been started against you in the above entitled court by MAKAH INDIAN TRIBE. Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you with this Summons.

In order to defend against the lawsuit, you must respond to the complaint by stating your defense in writing, and serve a copy upon the undersigned attorneys for the plaintiff within 20 days after the service of this Summons, or within 60 days if this Summons was served outside the State of Washington, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where the plaintiff is entitled to what they ask for because you have not responded. If you serve a notice of appearance on the undersigned attorneys, you are entitled to notice before a default judgment may be entered.

You may demand that the plaintiff file the lawsuit with the court. If you do so, the demand must be in writing and must be served upon the plaintiff. Within 14 days after the service of the demand, the plaintiff must file this lawsuit with the court, or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

//

//

//

SUMMONS
PAGE - 2

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

DATED this 20th day of December, 2023.

Respectfully submitted,

**SHER EDLING LLP**

*/s/Corrie J. Yackulic*
CORRIE J. YACKULIC, WSBA No. 16063
VICTOR M. SHER (*pro hac vice forthcoming*)
MATTHEW K. EDLING (*pro hac vice forthcoming*)
Sher Edling LLP
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Tel:     (628) 231-2500
Fax:    (628) 231-2929
Email:  corrie@cjylaw.com
          vic@sheredling.com
          matt@sheredling.com


*Attorneys for Plaintiff, SHOALWATER BAY INDIAN TRIBE*

**DRUMMOND WOODSUM & MACMAHON**

KAIGHN SMITH JR. (*pro hac vice forthcoming*)
84 Marginal Way, Suite 600
Portland, ME. 04101
Tel:     (207) 253-0559
Email: ksmith@dwmlaw.com

*Attorneys for Plaintiff, SHOALWATER BAY INDIAN TRIBE*

SUMMONS
PAGE - 3

CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH, SUITE 304
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 787-1915 • FACSIMILE: (206) 299-9725

1
2
3
4
5
6

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING**

7

MAKAH INDIAN TRIBE,

8                                        Plaintiff,

9        v.

10

EXXON MOBIL CORPORATION,
11   EXXONMOBIL OIL CORPORATION, BP
     P.L.C., BP AMERICA INC., CHEVRON
12   CORPORATION, CHEVRON USA, INC.,
     SHELL PLC, SHELL OIL COMPANY,
13   CONOCOPHILLIPS, CONOCOPHILLIPS
     COMPANY, PHILLIPS 66, and PHILLIPS 66
14   COMPANY,

15                                       Defendants.

16

No.  23-2-25216-1 SEA

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

17
18
19
20
21
22
23
24
25
26

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLP
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II. PARTIES ................................................................................................................... 4

    A.  Plaintiff ........................................................................................................... 4

    B.  Defendants ...................................................................................................... 5

III. JURISDICTION AND VENUE ................................................................................ 11

IV. FACTS ...................................................................................................................... 13

    A.  Fossil fuel use since the 1960s accounts for most greenhouse gasses in the atmosphere that are causing global warming ................................................ 14

    B.  Defendants have known that fossil fuels would cause catastrophic climate change since at least 1959 ............................................................................... 18

    C.  Defendants chose to deceive the public, and risk catastrophic climate change, in order to continue profiting from fossil fuels ................................. 35

    D.  Defendants strategized to use seemingly independent technical sources in order to confuse and mislead consumers about the scientific evidence for climate change ............................................................................................... 36

    E.  Defendants spread their deceptive messages to consumers in part through advertisements and other publications ........................................................... 43

    F.  Defendants funded and promoted seemingly independent scientists and groups to deceive the public about climate change ....................................... 49

    G.  Defendants continue to deceive the public by failing to disclose the impact of fossil fuels on climate change, claiming that their products reduce greenhouse gas emissions, promoting unproven technologies, and greenwashing ........... 58

    H.  Defendants fail to disclose the climate impacts of their fossil fuel products ......... 59

    I.  Defendants misleadingly promote fossil fuel products as "green," "sustainable," "carbon-neutral," and "lowering emissions." ............................ 61

    J.  Defendants promote unrealistic or unproven technologies as clean energy solutions for people currently relying on Defendants' fossil fuels ................. 67

    K.  Defendants misleadingly promote themselves as clean energy companies actively working to achieve net-zero emissions ........................................... 71

    L.  Alternative energy technologies, including some developed by Defendants, could have replaced or significantly reduced fossil fuel dependence ............... 85

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE i

M. Defendants' wrongful conduct is a proximate cause of the Tribe's harms. ............ 88

N. The Tribe has sustained, and will sustain, substantial harms and losses. ................. 89

V. LEGAL CLAIMS ................................................................................................. 92

COUNT ONE
PUBLIC NUISANCE – CH. RCW 7.48 ....................................................................... 92

COUNT TWO
WASHINGTON PRODUCT LIABILITY ACT, FAILURE TO WARN –
RCW 7.72 ............................................................................................................... 95

VI. PRAYER FOR RELIEF ....................................................................................... 97

VII. REQUEST FOR JURY TRIAL ............................................................................ 98

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE ii

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

## I.    INTRODUCTION

1.1    For decades, ExxonMobil, BP, Shell, Chevron and ConocoPhillips ("Defendants") have misled consumers and the public about the central role of fossil fuels in causing climate change. Since at least the 1950s, their own scientists have consistently concluded that fossil fuels produce carbon dioxide and other greenhouse gas pollution that increases global temperatures, destabilizing the climate and causing catastrophic consequences for the planet and its people. The industry has taken these internal scientific findings seriously, investing heavily to protect its own assets and infrastructure from rising seas, stronger storms, and other climate change impacts.  But rather than warn consumers and the public about these dangers, fossil fuel companies and their surrogates have for decades pushed disinformation to discredit the scientific consensus on climate change; to create doubt in the public's mind about the climate-disruptive impacts of burning fossil fuels; and to delay the energy economy's transition to a lower-carbon future. This successful climate deception campaign has had the purpose and effect of inflating and sustaining the market for fossil fuels, which—in turn—has driven up greenhouse gas emissions, accelerated global warming, and brought about devastating climate change impacts to the Makah Tribe and its reservation that continue unabated today.

1.2    Defendants' promotion and sale of fossil fuels has exploded since the Second World War, as have carbon dioxide ("$CO_2$") and other emissions from those products. Fossil fuel emissions—especially $CO_2$—are far and away the dominant driver of global warming.[1] The

---

[1] See Intergovernmental Panel on Climate Change ("IPCC"), *Summary for Policymakers in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report* (2021), at 4–9, https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 1 of 98

substantial majority of all anthropogenic (human-caused) greenhouse gas emissions in history have occurred from the 1950s to the present, a period known as the "Great Acceleration."[2] About three-quarters of all industrial $CO_2$ emissions in history have occurred since the 1960s,[3] and more than half have occurred since the late 1980s. The annual rate of $CO_2$ emissions from extraction, production, and consumption of fossil fuels has increased substantially since 1990.[4]

      1.3     Defendants' awareness of the negative impacts of fossil fuel consumption almost exactly tracks the onset of the Great Acceleration. Defendants have known since at least the 1950s that fossil fuels produce carbon dioxide and other greenhouse gas ("GHG") pollution that would warm the planet and destabilize our climate. Defendants' own scientists advised the companies repeatedly, starting as early as the 1950s, that climate impacts could be catastrophic, and that only a narrow window of time existed in which to act before the consequences became catastrophic.

      1.4     Rather than warn the public of these tremendous harms, however, Defendants mounted a disinformation campaign beginning as early as the 1970s to discredit the burgeoning scientific consensus on climate change; deny their own knowledge of climate change-related threats; create doubt about the reality and consequences of the impacts of burning fossil fuels; and delay the necessary transition to a lower-carbon future.

---

[2] Will Steffen et al., *The Trajectory of the Anthropocene: The Great Acceleration*, 2 The Anthropocene Review 81, 81 (2015).

[3] R.J. Andres et al., *A Synthesis of Carbon Dioxide Emissions from Fossil-Fuel Combustion*, 9 Biogeosciences 1845, 1851 (2012).

[4] Global Carbon Project, *Global Carbon Budget 2021*, https://www.globalcarbonproject.org/global/images/carbonbudget/Infographic_Emissions2021.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **2** of **98**

1.5     Defendants have further deceived customers and the public by misrepresenting the climate impacts of their products sold in Washington State and on the Makah Reservation. In a bid to reassure consumers that purchasing these products is good for the planet, Defendants advertise them as "cleaner," "emissions-reducing," and the like, while failing to disclose their harmful effects on the climate. This strategy is similar to the Tobacco industry's advertising playbook, which deceptively promoted "low tar" and "light" cigarettes as healthier smoking options, when the companies knew that any use of cigarettes was harmful. Defendants here likewise falsely present themselves as corporate leaders in the fight against climate change, claiming to invest substantially in low-emission technologies and zero-emission energy sources, while their businesses continue to focus overwhelmingly on fossil fuel production and sales.

1.6     Defendants' deceptive conduct and sophisticated promotion of fossil fuel products without warning of their dangers inflated and sustained demand for fossil fuels and forestalled the move to low- and no-carbon alternatives, resulting in billions of dollars in profits for Defendants.

1.7     Yet it is now the Makah Tribe and its citizens who are paying for the effects of Defendants' misconduct. The Tribe faces existential threats to its people and its land from climate change.  The Tribe has already spent millions to deal with climate change-induced disasters and protect its assets from future harms, and will spend many hundreds of millions more. Climate-disruption impacts include those resulting from rising sea levels, heavier rainfall concentrated in fewer months, many more days with extreme heat, drier soil moisture levels, reduced low stream flow levels and elevated high stream flow levels, more frequent and damaging wildfire, more frequent and intense storms and drought, flooding and erosion, human

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **3** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

health effects, especially for the most vulnerable, and much more. The Tribe brings this lawsuit to hold Defendants accountable for their deceptive and unfair conduct, and to pay for the damage their deceptive conduct has caused and will cause for decades to come.[5]

## II.    PARTIES

### A.    Plaintiff

2.1.    Plaintiff, the Makah Indian Tribe ("Makah Tribe" or "Tribe"), is a federally-recognized sovereign Native Nation that has occupied the lands and surrounding islands and waters of what is now the most northwestern portion of the State of Washington for millennia. The Makah Reservation, which consists of approximately 30,000 acres on northwestern tip of the Olympic Peninsula bordered to the north by the Strait of Juan de Fuca and to the west by the Pacific Ocean and including Tatoosh Island and Waadah Island, was reserved from a portion of the Tribe's aboriginal territory under the 1855 Treaty of Neah Bay, 12 Stat. 939, and subsequently enlarged through executive orders and statutes. As used herein, "Makah Reservation" includes the Tribe's treaty reservation, as expanded by executive orders and statutes, together with lands that the United States holds in trust for the Tribe near and contiguous to the Tribe's treaty reservation. The Tribe brings this action to vindicate its sovereign, proprietary, public trust, and parens patriae rights, to abate a public nuisance, and to recover for injuries to the Tribe's natural resources, property, and public health.

---

[5] Plaintiff hereby disclaims injuries arising on federal enclaves and those arising from Defendants' provision of non-commercial, specialized fossil fuel products to the federal government for military and national defense purposes. The Tribe seeks no recovery or relief attributable to these injuries.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **4 of 98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

**B.    Defendants**

2.2.    This suit concerns the wrongful promotion, marketing, and sale of fossil fuels. Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, BP P.L.C., BP America Inc., Chevron Corporation, Chevron USA, Inc., Shell plc, Shell Oil Company, ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company are multinational oil and gas companies that promote, market, and sell fossil fuels and fossil fuel-based products worldwide, including in Washington. All Defendants are either registered to do business in Washington or have wholly-owned subsidiaries registered to do business in Washington.

2.3.    <u>**Exxon Entities**</u>: **Exxon Mobil Corporation, ExxonMobil Oil Corporation**

a.    Defendant **Exxon Mobil Corporation** is a New Jersey corporation headquartered in Irving, Texas. Exxon Mobil Corporation is the parent company of numerous subsidiaries, which explore for, produce, refine, market, and sell fossil fuels worldwide. Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., ExxonMobil Refining & Supply Corporation, Exxon Company, U.S.A., Exxon Corporation, Standard Oil Company (NJ), and Mobil Corporation.

b.    Exxon Mobil Corporation controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels.  This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **5 of 98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

c.      Defendant **ExxonMobil Oil Corporation** is a New York corporation headquartered in Irving, Texas. ExxonMobil Oil Corporation is a wholly owned subsidiary of Exxon Mobil Corporation that acts on Exxon Mobil Corporation's behalf and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Mobil Oil Corporation.

d.      Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Exxon."

2.4.    **BP Entities: BP P.L.C., BP America Inc.**

a.      Defendant **BP P.L.C.** is registered in England and Wales with its principal place of business in London. BP P.L.C. is the parent company of numerous subsidiaries, which explore for, produce, refine, market, and sell fossil fuels worldwide. BP P.L.C. was formerly known as, did or does business as, and/or is the successor in liability to British Petroleum.

b.      BP P.L.C. controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels.  BP owns the Cherry Point Refinery in Whatcom County, the largest oil refinery in Washington State.

c.      Defendant **BP America Inc.** is a Delaware corporation headquartered in Houston, Texas. BP America is a wholly owned subsidiary of BP P.L.C. that acts on BP P.L.C.'s behalf and is subject to BP P.L.C.'s control. BP America Inc. was formerly known as, did or does business as, and/or is the successor in liability to Amoco Corporation, Amoco Oil

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **6** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

Company, ARCO Products Company, Atlantic Richfield Washington Corporation, Atlantic Richfield Company (a Delaware Corporation), BP Exploration & Oil, Inc., BP Products North America Inc., BP Amoco Corporation, BP Amoco Plc, BP Oil, Inc., BP Oil Company, Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), and The Atlantic Richfield Company (a Pennsylvania Corporation) and its division, the Arco Chemical Company.

d.      Defendants BP P.L.C. and BP America, Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "BP."

2.5.    **Chevron Entities: Chevron Corporation, Chevron USA, Inc.**

a.      Defendant **Chevron Corporation** is a Delaware corporation headquartered in San Ramon, California. Chevron Corporation is the parent company of numerous subsidiaries, which explore for, produce, refine, market, and sell fossil fuels worldwide.

b.      Chevron Corporation controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing of its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels.

c.      Defendant **Chevron U.S.A. Inc.** is a Pennsylvania corporation headquartered in San Ramon, California. Chevron U.S.A. Inc. is a wholly owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control. Chevron U.S.A. Inc. was formerly known as, did or does business as,

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **7** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

16

and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, and Chevron Chemical Company.

d.     Defendants Chevron Corporation and Chevron U.S.A. Inc., together with their predecessors, successors, parents, subsidiaries, affiliates, and divisions, are collectively referred to herein as "Chevron."

2.6.     **Shell Entities: Shell plc, Shell Oil Company**

a.     Defendant **Shell plc** (formerly Royal Dutch Shell PLC) is incorporated in England and Wales, headquartered in The Hague, Netherlands. Shell plc is the parent company of numerous divisions, subsidiaries, and affiliates, referred to collectively as the "Shell Group," that engage in all aspects of the fossil fuel industry including exploration, development, extraction, manufacturing and energy production, transport, trading, marketing, and sales.

b.     Shell plc controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels. Shell owned and operated the Shell Anacortes Refinery in Whatcom County prior to 1998, and the Puget Sound Refinery in Skagit County from 1998 to 2021.

c.     Defendant **Shell Oil Company** is a Delaware corporation headquartered in Houston, Texas. Shell Oil Company is a wholly owned subsidiary of Shell plc that acts on Shell plc's behalf and is subject to Shell plc's control. Shell Oil Company was formerly known as, did or does business as, and/or is the successor in liability to Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Shell Trading (US) Company, Shell

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **8** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

Energy Services, Texaco Inc., The Pennzoil Company, Shell Oil Products Company LLC, Shell Oil Products Company, Star Enterprise, LLC, and Pennzoil-Quaker State Company.

      d.     Defendants Shell plc, Shell Oil Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "Shell."

      2.7.    **ConocoPhillips Entities: ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company**

      a.     Defendant **ConocoPhillips** is incorporated in Delaware and has its principal place of business in Houston, Texas. ConocoPhillips consists of numerous divisions, subsidiaries, and affiliates that execute ConocoPhillips's fundamental decisions related to all aspects of the fossil fuel industry, including exploration, extraction, production, manufacture, transport, and marketing.

      b.     ConocoPhillips controls and has controlled whether and to what extent it or its subsidiaries promote, market, or sell fossil fuels. This includes decisions related to climate change and greenhouse gas emissions, marketing its brand and fossil fuels, as well as strategic communications concerning climate change and the role of fossil fuels. ConocoPhillips's most recent annual report subsumes the operations of the entire ConocoPhillips group of subsidiaries under its name. ConocoPhillips has developed and purportedly implements a corporate Climate Change Action Plan to govern climate change decision making across all entities in the ConocoPhillips group.

      c.     Defendant **ConocoPhillips Company** is a wholly owned subsidiary of ConocoPhillips that acts on ConocoPhillips's behalf and is subject to ConocoPhillips's control.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **9** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

ConocoPhillips Company is incorporated in Delaware and has its principal office in Bartlesville, Oklahoma. ConocoPhillips Company is registered to do business in Washington.

        d.      Defendant **Phillips 66** is incorporated in Delaware and has its principal place of business in Houston, Texas. It encompasses downstream fossil fuel processing, refining, transport, and marketing segments that were formerly owned and/or controlled by ConocoPhillips. Phillips 66 owns the Ferndale Refinery in Whatcom County.

        e.      Defendant **Phillips 66 Company** is a wholly owned subsidiary of Phillips 66 that acts on Phillips 66's behalf and is subject to Phillips 66's control. Phillips 66 Company is incorporated in Delaware and has its principal office in Houston, Texas. Phillips 66 Company is registered to do business in Washington. Phillips 66 Company was formerly known as, did or does business as, and/or is the successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.

        f.      Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are referred to herein as "ConocoPhillips."

    2.8.    When this Complaint references an act or omission of Defendants, unless specifically attributed or otherwise stated, such references should be interpreted to mean that the officers, directors, agents, employees, or representatives of Defendants committed or authorized such an act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **10** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

### III.  JURISDICTION AND VENUE

3.1.    This Court has subject matter jurisdiction as this action arises within the Makah Reservation within the State of Washington and this Court is a court of general jurisdiction.

3.2.    This Court has personal jurisdiction over Defendants pursuant to RCW 4.28.185(1)(a)-(b) and RCW 19.86.160 because this complaint arises out of business transacted in Washington and tortious conduct directed at Washington residents, including the Tribe and its citizens.

3.3.    Each Defendant is transacting or has transacted substantial business in Washington; is contracting or has contracted to supply services or things in Washington; has or does derive substantial revenue in Washington or engages in a persistent course of conduct in Washington; had or has interests in, used or uses, or possessed or possesses real property in Washington; and/or caused tortious injury in Washington and has intentionally engaged in conduct aimed at Washington, which has caused harm they knew was likely to be incurred in Washington, including on the Makah Reservation. Each Defendant has sufficient contacts with Washington to give rise to the current action, has continuous and systematic contacts with Washington, and/or has consented either explicitly or implicitly to the jurisdiction of this Court.

3.4.    A significant amount of Defendants' fossil fuels are or have been transported, refined, distributed, promoted, marketed, sold, and/or consumed in Washington, including on the Makah Reservation, from which Defendants derive and have derived substantial revenue. Defendants—directly and through their subsidiaries and/or predecessors-in-interest—supplied substantial quantities of fossil fuels to Washington State during the period relevant to this

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 11 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

litigation. Defendants also market and sell petroleum products, including engine lubricants and motor oils, in Washington, including on the Makah Reservation, through local retailers.

3.5.     Hundreds of Defendant-branded gas stations serve Washington consumers in the state. Through their various agreements with dealers, franchises, or otherwise, Defendants direct and control the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuels at their respectively branded gas stations in Washington, including point-of-sale advertising and marketing. Defendants dictate which grades and formulations of their gasoline may be sold at their respectively branded stations. Defendants also maintain websites to direct Washington residents to their nearby retail service stations.

3.6.     Defendants have purposefully directed and continue to purposefully direct their tortious conduct toward Washington by distributing, marketing, advertising, promoting, and supplying fossil fuels in Washington, with knowledge that fossil fuels have caused and will continue to cause climate crisis-related injuries in Washington, including in and on the Makah Reservation.

3.7.     Over the past several decades, Defendants, directly and through their surrogates, have spent millions of dollars on radio, television, outdoor advertisements, and social media sites in the Washington market related to their fossil fuels. As just one example, a December 12, 2003 Op-Ed in the Seattle *Post-Intelligencer*, authored by former API and Global Climate Coalition executive William O'Keefe, claimed the "science of climate change" was "far from settled," relying on a "review" by Willie Soon, who was later exposed as receiving millions of dollars in funding from the oil and gas industry, including at least some of the Defendants here. In the Op-Ed, O'Keefe asserts, falsely, that "Neither I nor anyone else knows whether climate over the

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **12** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

course of this century will be a scientific curiosity or a serious ecological threat," when it was well known for years, throughout the fossil fuel industry, that climate change posed a "serious ecological threat." Since the 1970's and continuing today, Defendants have also advertised in print publications circulated widely to Washington consumers, including but not limited to: The Atlantic, The Economist, Fortune Magazine, The New York Times, People, Sports Illustrated, Time Magazine, The Washington Post, Newsweek, and The Wall Street Journal.

3.8.    As described below, Defendants' advertising campaigns have concealed and misled consumers about the role of fossil fuels in causing climate change and failed to warn consumers about those hazards. That conduct was and is intended to increase use of fossil fuels in and outside Washington, resulting in the Tribe's injuries.

3.9.    Further, as described below, Defendants knew or should have known—based on information passed to them from their internal research divisions, affiliates, trade associations, and industry groups—that their actions in Washington, including on the Makah Reservation, and elsewhere would result in these injuries to the Tribe. The climate effects described herein are direct and foreseeable results of Defendants' conduct, collectively and individually.

3.10.    Venue is proper in King County pursuant to RCW 4.12.020 and 4.12.025, and Superior Court Civil Rule 82, because Defendants transact business in King County.

## IV.    FACTS

4.1.    Part A provides background on the role of fossil fuels in causing global warming. Part B describes Defendants' knowledge, dating back many decades, that continued use of fossil fuels would cause severe harm in Washington, including on the Makah Reservation, and elsewhere. Part C describes how Defendants not only concealed this information from the public,

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **13** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

but affirmatively worked to deny or discredit it. Defendants simultaneously acted on that same information to protect their own assets and future profits from the sale of fossil fuels. Part D describes how, to this day, Defendants continue to mislead the public by falsely claiming they offer clean and green fossil fuel products, and are leaders in the transition to clean energy. Part E describes how alternative energy technologies could have replaced or significantly reduced fossil fuel dependence. Part F describes how Defendants' tortious actions are a proximate cause of the Tribe's harms. Part G describes the Tribe's harms, which include damage to property, damage to and loss of natural resources and adverse public health effects.

**A.     Fossil fuel use since the 1960s accounts for most greenhouse gasses in the atmosphere that are causing global warming**

4.2.    Producing and consuming fossil fuels releases carbon dioxide, methane, and other pollutants into the atmosphere. Called "greenhouse gasses," these pollutants trap heat in the atmosphere, causing global warming. Carbon dioxide is the most prevalent greenhouse gas, while methane is responsible for a third of the warming the Earth has experienced thus far.

4.3.    As the below graph illustrates, consuming fossil fuels is the principal cause of human emissions of carbon dioxide since the 1950's:

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **14 of 98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500



**Figure 1**: Annual Global Emissions, 1850–2020[6]

4.4.    Increased emissions from fossil fuel consumption has led to an increase in the concentration of carbon dioxide in the Earth's atmosphere. Since 1960, carbon levels in the atmosphere spiked from under 320 parts per million ("ppm") to approximately 419 ppm.[7] From 1960 to 1970, atmospheric $CO_2$ increased by an average of approximately 1 ppm per year. Over the last five years, it has increased by around 2.5 ppm per year.[8] In other words, as the world consumes more and more fossil fuels, carbon dioxide levels increase at a faster rate. This traps

---

[6]  Global   Carbon   Project,   <u>Global   Carbon   Budget   2021</u>   83   (Nov.   4,   2021),
https://www.globalcarbonproject.org/carbonbudget/archive/2021/GCP_CarbonBudget_2021.pdf
[7] Global Monitoring Laboratory, <u>Trends in Atmospheric Carbon Dioxide</u>, NOAA (last visited Sept.                                    30,                                    2022),
https://gml.noaa.gov/dv/data/?parameter_name=Carbon%2BDioxide&type=Insitu
[8] Global Monitoring Laboratory, <u>Trends in Atmospheric Carbon Dioxide</u>, NOAA (last visited Sept.                                    30,                                    2022),
https://gml.noaa.gov/dv/data/?parameter_name=Carbon%2BDioxide&type=Insitu

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **15** of **98**

1   ever more heat in the atmosphere and increases the Earth's temperature at a faster pace and to a

2   greater extent.

3       4.5.     The graph below illustrates how the rise in human emissions of carbon dioxide

4                is connected to the rise of carbon dioxide levels in the atmosphere:



**Figure 2**: Atmospheric CO₂ Concentration and Annual Emissions[9]

15      4.6.     Concentrations of greenhouse gases in the atmosphere are now at the highest level

16  in at least three million years.[10]

17      4.7.     Greenhouse gasses prevent heat from the sun from being radiated back into space.

18  As greenhouse gases accumulate in the atmosphere, they trap more heat. The rise in greenhouse

19  gasses is leading to a rise in global mean temperatures.

---

[9] Rebecca Lindsey, Climate Change: Atmospheric Carbon Dioxide, NOAA (June 23, 2022), https://www.climate.gov/news-features/understanding-climate/climate-change-atmospheric-carbon-dioxide.

[10] Science Daily, More CO₂ Than Ever Before in 3 Million Years, Shows Unprecedented Computer Simulation (Apr. 3, 2019), https://www.sciencedaily.com/releases/2019/04/190403155436.htm.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **16** of **98**

4.8.    Global warming has contributed to increasingly devastating wildfires, flooding, droughts, rising temperatures and sea levels, and ocean acidification to the harm and detriment of the Makah Reservation. The health of the citizens of the Makah Tribe  has also suffered and will suffer from extreme heat and extreme weather, worsened air quality, and vector-borne illnesses.

4.9.    According to the climate impacts group at the University of Washington, with global warming of at least 1.5 degrees Celsius, by 2050, Washington, including the Makah Reservation, is projected to experience:

a.      A 67 percent increase in the number of days per year above ninety degrees Fahrenheit, relative to 1976-2005, leading to an increased risk of heat-related illness and death, warmer streams, and more frequent algal blooms;

b.      A decrease of thirty-eight percent in the snowpack, relative to 1970-1999, leading to reduced water storage, irrigation shortages, and winter and summer recreation losses;

c.      An increase of sixteen percent in winter streamflow, relative to 1970-1999, leading to an increased risk of river flooding;

d.      A decrease of twenty-three percent in summer streamflow, relative to 1970-1999, leading to reduced summer hydropower, conflicts over water resources, and negative effects on salmon populations; and

e.      An increase of one and four-tenths feet in sea level, relative to 1991-2010, leading to coastal flooding and inundation, damage to coastal infrastructure, and bluff erosion.[11]

---

[11] WASH. REV. CODE § 70A.45.020, Intent - 2020 c 79 (2020).  Snover, A.K., C.L. Raymond, H.A. Roop, H. Morgan, 2019. No Time to Waste. The Intergovernmental Panel on Climate Change's Special Report on Global Warming of 1.5°C and Implications for Washington State. Briefing paper prepared by the Climate Impacts Group, University of Washington, Seattle.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **17** of **98**

4.10.   As the next sections describe, most emissions from increasing consumption of fossil fuels have occurred *since* Defendants knew that fossil fuels would cause such harms, yet Defendants did not warn consumers about these risks. Instead, Defendants worked to deceive the public about the role of fossil fuels in causing climate change in order to protect their profits.

**B.    Defendants have known that fossil fuels would cause catastrophic climate change since at least 1959.**

4.11.   Defendants studied the effects of fossil fuel combustion on climate for decades, developing a sophisticated understanding of climate disruption due to fossil fuel use that far exceeded the knowledge of ordinary consumers.

4.12.   Defendants knew climate change posed a risk to their fossil fuel business. Internal documents regularly mention these risks.

4.13.   In 1954, the American Petroleum Institute (API), the industry's main trade association, learned from geochemist Harrison Brown and his colleagues at the California Institute of Technology that fossil fuels had caused atmospheric carbon dioxide levels to increase by about 5% since 1840.[12] API continued to fund measurements of carbon dioxide levels after that, but did not share the results publicly.[13]

4.14.   In 1957, Humble Oil (predecessor-in-interest to ExxonMobil) measured an increase in atmospheric carbon dioxide similar to that measured by Harrison Brown and shared the results with API.

---

Updated                 02/2019.                 https://cig.uw.edu/wp-content/uploads/sites/2/2019/02/NoTimeToWaste_CIG_Feb2019.pdf

[12] See Benjamin Franta, Early Oil Industry Knowledge of CO$_2$ and Global Warming, 8 Nature Climate Change 1024, 1024–25 (2018).
[13] Id.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **18** of **98**

4.15.   In 1959, nuclear physicist Edward Teller warned API members, including Defendants, that "a temperature rise corresponding to a 10[%] increase in carbon dioxide will be sufficient to melt the icecap and submerge . . . [a]ll the coastal cities . . . this chemical contamination is more serious than most people tend to believe."[14]

4.16.   In 1965, President Lyndon B. Johnson's Science Advisory Committee reported that burning fossil fuels was adding carbon dioxide to the Earth's atmosphere and could lead to uncontrollable and significant changes in the Earth's climate, and rapid sea-level rise.[15]

4.17.   API promptly discussed this report with its members, stating: "[t]he substance of the report is that there is still time to save the world's peoples from the catastrophic consequence of pollution, but time is running out."[16] API's President emphasized the report's finding that "the pollution from internal combustion engines is so serious, and is growing so fast, that an alternative nonpolluting means of powering automobiles, buses, and trucks is likely to become a national necessity."[17]

4.18.   API subsequently commissioned research on carbon dioxide pollution from the Stanford Research Institute.[18] In 1968, the SRI scientists informed API that "[p]ast and present studies of $CO_2$ are detailed and seem to explain adequately the present state of $CO_2$ in the

---

[14] Edward Teller, Energy Patterns of the Future, in Energy and Man: A Symposium 53–72 (1960).
[15] President's Science Advisory Committee, Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel 9, 119–24 (Nov. 1965), https://hdl.handle.net/2027/uc1.b4315678.
[16] See Franta, Early Oil Industry Knowledge of $CO_2$ and Global Warming at 1024–25.
[17] Id.
[18] Elmer Robinson & R.C. Robbins, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, Stanford Rsch. Inst. (Feb. 1968), https://www.smokeandfumes.org/documents/document16.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 19 of 98

atmosphere." They warned there was "no doubt" that the "potential damage to our environment could be severe."[19]

4.19.    In a supplemental report the next year (1969), the Stanford Research Institute projected that, if present fossil fuel consumption trends continued, the concentration of carbon dioxide in the atmosphere would reach 370 parts per million ("ppm") by 2000.    The report explicitly connected the rise in $CO_2$ levels to the combustion of fossil fuels, finding it "unlikely that the observed rise in atmospheric $CO_2$ has been due to changes in the biosphere." The scientists' projection was accurate. In 2000, the concentration of carbon dioxide in the atmosphere was 369.64 ppm.[20]

4.20.    API shared this research with Defendants.

4.21.    Exxon also researched climate science. In the 1970s and 1980s, Exxon scientists confirmed that burning fossil fuels was the dominant source of carbon dioxide pollution and accurately predicted future concentrations of carbon dioxide and the associated rise in temperature. They briefed management at the highest levels of their findings.

4.22.    In 1977, James Black, an Exxon scientist, briefed Exxon management that "current scientific opinion overwhelmingly favors attributing atmospheric carbon dioxide increase to fossil fuel consumption," and doubling atmospheric carbon dioxide would, according

---

[19] Elmer Robinson & R.C. Robbins, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants Supplement, Stanford Rsch. Inst. (June 1969).
[20] NASA Goddard Institute for Space Studies, Global Mean $CO_2$ Mixing Ratios (ppm): Observations, https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 20 of 98

to the best climate model available, "produce a mean temperature increase of about 2°C to 3°C" by 2050.[21] Black illustrated this outcome for management:



**Figure 3:** Future Global Warming Predicted Internally by Exxon in 1977[22]

Black's predictions were correct. In 2023, independent researchers added the red line to Black's graph, showing that the observed change in temperature closely tracked his 1977 prediction.[23]

   4.23.   Black reported to management that projected future fossil fuel use would lead to serious damage, including "more rainfall" that could reduce or destroy the agricultural output of

---

[21] Letter from J.F. Black, Exxon Research and Engineering Co., to F.G. Turpin, Exxon Research and Engineering Co., The Greenhouse Effect, ClimateFiles (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-on-greenhouse-effect-for-exxon-corporation-management-committee.
[22] Id. The company predicted global warming of 3°C by 2050, with 10°C warming in polar regions. The difference between the dashed and solid curves prior to 1977 represents global warming that Exxon believed may already have been occurring.
[23] G. Supran et al., Assessing ExxonMobil's global warming projections. Science 379, eabk0063(2023).                                    DOI:10.1126/science.abk0063.
https://www.science.org/doi/10.1126/science.abk0063

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **21** of **98**

some countries. Black highlighted the need to make "hard decisions regarding changes in energy strategies" in the next 5-10 years (i.e., before 1987) to avoid these harms.[24]

4.24.   In 1979, a confidential Exxon memorandum stated "[t]he most widely held theory [about climate change] is that:

- The increase is due to fossil fuel combustion
- Increasing $CO_2$ concentration will cause a warming of the earth's surface
- The present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050.

4.25.   The memo highlighted that there was "no practical means" to capture and store carbon emissions and so "dramatic changes in patterns of energy use would be required" to avoid environmental damage. Significantly, the memo said that in order to limit $CO_2$ emissions to avoid these harms, fossil fuel emissions would have to peak in the 1990s and alternative energies would need to be rapidly deployed. Eighty percent of fossil fuel resources would remain undeveloped; thus "coal and possibly other fossil fuel resources could not be utilized to an appreciable extent." Certain fossil fuels, such as shale oil, could not be substantially exploited at all.[25]

4.26.   Defendants did not follow this path. They developed and refined techniques to recover shale oil, leading to the shale oil and gas boom in the late 2000s.[26] And carbon dioxide

---

[24] Id.
[25] Letter from W.L. Ferrall, Exxon Research and Engineering Co., to Dr. R.L. Hirsch, Controlling Atmospheric CO2, Climate Investigations Ctr. (Oct. 16, 1979), https://www.industrydocuments.ucsf.edu/docs/mqwl0228.
[26] Rapier, Robert. How the Shale Boom Turned the World Upside Down. (April 21, 2017), https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/?sh=1a721ec677d2.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 22 of 98

levels reached 400 ppm in 2015, just five years later than the date Exxon had predicted back in 1979.[27]

4.27.   In 1979, API and its members, including all Defendants, convened a Task Force to monitor and share cutting edge climate research among the oil industry and to evaluate the implications for their fossil fuel businesses.[28]

4.28.   API prepared a background paper on carbon dioxide and climate for the Task Force, stating that carbon levels were rising steadily and would cause global warming. However, the effects of global warming would likely go undetected until 2000 due to a natural cooling trend.[29]

4.29.   In 1980, API's Task Force met with Dr. John Laurmann, "a recognized expert in the field of $CO_2$ and climate," for seven hours.[30] Laurmann told the Task Force there was "strong empirical evidence" that rising carbon levels were mainly due to burning fossil fuels and there was a "scientific consensus" that increased carbon levels could cause "large future climatic response[s]." Laurmann projected the following:

---

[27] Nicola Jones, How the World Passed a Carbon Threshold and Why It Matters, Yale Env't 360 (Jan. 26, 2017), http://e360.yale.edu/features/how-the-world-passed-a-carbon-threshold-400ppm-and-why-it-matters.

[28] Neela Banerjee, Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too, Inside Climate News (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco.

[29] Memorandum from R.J. Campion to J.T. Burgess, The API's Background Paper on $CO_2$ Effects, Climate Investigations Ctr. (Sep. 6, 1979), https://www.industrydocuments.ucsf.edu/docs/lqwl0228.

[30] Letter from Jimmie J. Nelson, American Petroleum Institute, to AQ-9 Task Force, The CO2 Problem: Addressing Research Agenda Development, Climate Investigations Ctr. (Mar. 18, 1980), https://www.industrydocuments.ucsf.edu/docs/gffl0228.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **23** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

LIKELY IMPACTS:

    1°C RISE (2005): BARELY NOTICEABLE

    2.5°C RISE (2038): MAJOR ECONOMIC CONSEQUENCES, STRONG
        REGIONAL DEPENDENCE

    5°C RISE (2067): GLOBALLY CATASTROPHIC EFFECTS

4.30.   Laurmann also explained that, while some uncertainty remains, if achieving high market penetration for new energy sources would require a long time, there was "no leeway" for delay. The Task Force planned to research the "market penetration requirements of introducing a new energy source into worldwide use."[31]

4.31.   In 1980, Imperial Oil Limited, an Exxon subsidiary, reported to managers and environmental staff at multiple affiliated Esso and Exxon companies that there was "no doubt" that fossil fuels were aggravating the build-up of $CO_2$ in the atmosphere.[32] Further, while it was possible to capture carbon emitted from power plants, "removal of only 50% of the $CO_2$ would double the cost of power generation."[33]

4.32.   In 1980, an Exxon manager, Henry Shaw, briefed management on the "$CO_2$ Greenhouse Effect."[34] Shaw's briefing stated that burning fossil fuels was increasing carbon dioxide levels and this would "most likely" result in global warming of approximately 3°C around the year 2060. Calculations predicting a lower temperature increase were "not held in

---

[31] Id.

[32] Imperial Oil Ltd., Review of Environmental Protection Activities for 1978–1979 (Aug. 6, 1980),   http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/p2.

[33] Id.

[34] Memorandum from Henry Shaw to T.K. Kett, Exxon Research and Engineering Company's Technological   Forecast:   CO₂   Greenhouse   Effect   (Dec.   18,   1980), https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And.html.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 24 of 98

high regard by the scientific community." While the oceans could absorb some heat, that could delay (but not prevent) the temperature increase "by a few decades." Natural climate fluctuations would hide global warming from carbon emissions until around the year 2000. The future impacts, however, would be "dramatic," including greater rainfall, reduced agricultural output, and sea level rise. The memo included the following illustration, showing that significant global warming will have already occurred before it exceeded the range of natural "climatic noise":



**Figure 4:** Future Global Warming Predicted Internally by Exxon in 1980[35]

The red line indicates actual observed temperatures following the report.[36]

---

[35] Id. The company anticipated a doubling of carbon dioxide by around 2060 and that the oceans would delay the warming effect by a few decades, leading to approximately 3°C warming by the end of the century.

[36] G. Supran et al., Assessing ExxonMobil's global warming projections. Science 379, eabk0063(2023).                                     DOI:10.1126/science.abk0063.
https://www.science.org/doi/10.1126/science.abk0063

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 25 of 98

4.33.    Shaw also reported on Exxon's research into "the market penetration of non-fossil fuel technologies," and reported that, all other things being equal, alternative energy "would need about 50 years to penetrate and achieve roughly half of the total [energy] market."[37]

4.34.    Also in 1980, the head of Exxon's Research and Engineering Company wrote to Exxon's Senior Vice President, stating in part that: "the greenhouse effect is receiving widespread attention based in part on dramatic claims and dire predictions that are appearing in the popular press. It is being cited, for instance, as an argument in opposition to any major U.S-synfuels program. . . Our data could well influence Exxon's view about the long-term attractiveness of coal and synthetics relative to nuclear and solar energy."[38]

4.35.    In 1981, Exxon staff sent an internal "Scoping Study on $CO_2$" to management.[39] The study describes Exxon's motivations for engaging in climate research. Exxon intended to closely monitor outside research for its own "planning," acknowledging that predictions of climate models will influence public perception of the problem. Exxon also sought to "enhance the Exxon image and build public relations value." The study recommends against expanding the climate research program because the current research program was already meeting these goals, noting there was not a current threat to Exxon's business from legislation. However, because the cost to capture and store carbon was "exorbitant," "[e]nergy conservation or shifting to renewable energy sources[] represent the only options that might make sense" in the future.[40]

---

[37] Id.
[38] Exxon's View and Position on "Greenhouse Effect." (Jan. 29, 1980) https://insideclimatenews.org/wp-content/uploads/2015/09/Letters-to-Senior-VPS-1980.pdf.
[39] Letter from G.H. Long, Exxon Research and Engineering Co., to P.J. Lucchesi et al., Atmospheric $CO_2$ Scoping Study, Climate Investigations Ctr. (Feb. 5, 1981), https://www.industrydocuments.ucsf.edu/docs/yxfl0228.
[40] Id.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **26** of 98

4.36.   Also in 1981, Exxon scientist Roger Cohen warned his colleagues that Exxon's predictions of future climate impacts "based only on our knowledge of availability and economics [of fossil fuel consumption] become hazardous." Such a scenario would "produce effects which will indeed be catastrophic (at least for a substantial fraction of the world's population)."[41]

4.37.   In 1981, Exxon stated its position on the growth of carbon dioxide in the atmosphere. According to Exxon, growing fossil fuel consumption will lead atmospheric $CO_2$ levels to double, and doubling $CO_2$ levels will lead to a global average temperature rise of 3°C. This will cause "[m]ajor shifts in rainfall/agriculture" and "polar ice may melt."[42]

4.38.   In 1982, API commissioned a report from scientists at Columbia University. The report found that, despite differences in climate model predictions, there was a scientific consensus that doubling carbon levels in the atmosphere would result in an average global temperature rise of about 3°C. The scientists told API that "[s]uch a warming can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change,

---

[41]Memorandum from R.W. Cohen to W. Glass, ClimateFiles (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption.
[42] Memorandum from Henry Shaw to Dr. E.E. David, $CO_2$ Position Statement, Inside Climate News (May 15, 1981) (footnote omitted), https://insideclimatenews.org/documents/exxon-position-co2-1981.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

the height of the sea level can increase considerably and the world food supply can be affected."[43]

Exxon's independent research also confirmed this.[44]

4.39.    In a confidential primer[45] on climate change that Exxon circulated to management

in 1982, Exxon illustrated how future fossil fuel use would lead carbon levels to rise, along with

global temperatures:

---

[43] American Petroleum Institute, Climate Models and CO2 Warming: A Selective Review and Summary (Columbia Univ., Mar. 1982), https://assets.documentcloud.org/documents/2805626/1982-API-Climate-Models-and-CO2-Warming-a.pdf.

[44] See Memorandum from Roger W. Cohen, Exxon Research and Engineering Co., to A.M. Natkin, Exxon Corp. Office of Science and Technology, ClimateFiles (Sept. 2, 1982), http://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research (discussing research articles and summarizing the findings of research in climate modeling).

[45] Memorandum from M.B. Glaser, $CO_2$ "Greenhouse" Effect, Exxon Research and Engineering Company (Nov. 12, 1982), https://insideclimatenews.org/wp-content/uploads/2015/09/1982-Exxon-Primer-on-CO2-Greenhouse-Effect.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **28** of **98**

**Figure 5:** Exxon's Internal Prediction of Future $CO_2$ Increase and Global Warming from 1982[46]

Exxon's predictions were accurate. The blue line represents actual observed carbon levels and the red line shows actual observed temperature increases, closely tracking Exxon's predictions.

4.40.   The primer warned of many climate impacts Exxon had acknowledged in other memos, including "climate related famine," and "potentially catastrophic effects" such as

---

[46] Id.  The company predicted a doubling of atmospheric carbon dioxide concentrations above preindustrial levels by around 2070 (left curve), with a temperature increase of more than 2°C over the 1979 level (right curve). The same document indicated that Exxon estimated that by 1979 a global warming effect of approximately 0.25°C may already have occurred.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **29** of 98

1    melting of the Antarctic ice sheet that would flood Washington, D.C. and the state of Florida.

2    The primer also warned of feedback loops—events triggered by warming that could release

3    massive amounts of greenhouse gasses, leading to even further warming.

4        4.41.   The primer also estimated that undertaking "[s]ome adaptive measures" (not all

5    of them) would cost "a few percent of the gross national product estimated in the middle of the

6    next century" (i.e., $400 billion in 2018).[47] "Mitigation of the 'greenhouse effect' would require

7    major reductions in fossil fuel combustion."[48]

8        4.42.   In 1982, the Director of Exxon's Theoretical and Mathematical Sciences

9    Laboratory, Roger Cohen, wrote Alvin Natkin of Exxon's Office of Science and Technology

10   stating that "a clear scientific consensus has emerged . . . that a doubling of atmospheric CO2

11   would result in an average global temperature rise of $(3.0 \pm 1.5)$ °C. . . . There is unanimous

12   agreement in the scientific community that a temperature increase of this magnitude would bring

13   about significant changes in the earth's climate. . . The time required for doubling of atmospheric

14   CO2 depends on future world consumption of fossil fuels."[49]  Cohen noted that "the results of

15   our [Exxon's] research are in accord with the scientific consensus on the effect of increased

16   atmospheric CO2 on climate."

---

[47] See Gross National Product, Fed. Reserve Bank of St. Louis (updated Mar. 26, 2020), https://fred.stlouisfed.org/series/GNPA.
[48] Memorandum from M.B. Glaser, CO₂ "Greenhouse" Effect, Exxon Research and Engineering Company (Nov. 12, 1982), https://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf.
[49] Memorandum from Roger W. Cohen, Exxon Research and Engineering Co., to A.M. Natkin, Exxon Corp. Office of Science and Technology, ClimateFiles (Sept. 2, 1982), http://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **30** of 98

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

4.43.   In October 1982, at a symposium that API members, including Exxon, attended, the president of Columbia University's Geophysical Observatory delivered a speech wherein he stated: "[f]ew people doubt that the world has entered an energy transition away from dependence upon fossil fuels and toward some mix of renewable resources that will not pose problems of $CO_2$ accumulation."

4.44.   In 1988, Shell issued a confidential internal report acknowledging that burning fossil fuels is a primary driver of global warming and would "create significant changes in sea level, ocean currents, precipitation patterns, regional temperature and weather." "[B]y the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation." The report emphasized that "the potential implications for the world are . . . so large that policy options [to reduce emissions] need to be considered much earlier." Thus, rather than research "what the world may be facing exactly," research should be directed to ways to reduce emissions and alternate energy options.[50]

4.45.   Shell also acknowledged that: "it is possible that perception of a serious environmental threat [such as climate change] could swing opinion away from fossil fuel combustion and lead to a revival of interest in conservation, renewable sources and particularly nuclear energy."[51] In assessing the "[i]mplications for Shell Companies . . . Group Planning felt

---

[50] Shell Internationale Petroleum, Greenhouse Effect Working Group, The Greenhouse Effect (May 1988), https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239; https://s3.documentcloud.org/documents/4411090/Document3.pdf
[51] Id. at 19.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 31 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

there was a possibility that an increasing awareness of the greenhouse effect might change people's attitudes towards non-fossil energy sources, especially nuclear."[52]

4.46.   In the mid-1990s, Shell began using scenarios to plan how the company could respond to various global forces in the future. In one scenario published in a 1998 internal report, Shell paints an eerily prescient scene:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the U.S. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry or the government. After all, two successive IPCC reports since 1993 have reinforced the human connection to climate change . . . Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[53]

4.47.   Defendants considered their predictions of climate change to be so reliable, they based multi-million dollar investments on them. Defendants spent millions raising offshore drilling platforms to account for future global warming-induced sea level rise; reinforcing offshore oil platforms to withstand increased wave strength and storm severity; developing technology and infrastructure to extract, store, and transport fossil fuels in a warming arctic

---

[52] *Id.* at p. 23
[53] Royal Dutch/Shell Group, Group Scenarios 1998–2020 115, 122 (1998), http://www.documentcloud.org/documents/4430277-27-1-Compiled.html.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **32** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

environment; and developing and patenting designs for equipment intended to extract crude oil and/or natural gas in areas previously unreachable because of the presence of polar ice sheets.[54]

4.48.   As early as 1973, Exxon obtained a patent for a cargo ship capable of breaking through sea ice[55] and for an oil tanker[56] designed specifically for use in previously unreachable areas of the Arctic.

4.49.   In 1974, Chevron, in like manner, obtained a patent for a mobile arctic drilling platform designed to withstand significant interference from lateral ice masses,[57] allowing for drilling in areas with increased ice flow movement due to elevated temperature.

4.50.   That same year, Texaco (Chevron) worked toward obtaining a patent for a method and apparatus for reducing ice forces on a marine structure prone to being frozen in ice through natural weather conditions,[58] allowing for drilling in previously unreachable Arctic areas that would become seasonally accessible.

4.51.   Shell obtained a patent similar to Texaco's (Chevron) in 1984.[59]

4.52.   In 1989, Norske Shell, Royal Dutch Shell's Norwegian subsidiary, altered designs for an offshore drilling platform that was anticipated to operate until roughly 2065. The

---

[54] Lieberman, Amy and Susanne Rust. Big Oil braced for global warming while it fought regulations. (Dec. 31, 2015)  https://graphics.latimes.com/oil-operations/
[55] ExxonMobil Research Engineering Co., Patent US3727571A: Icebreaking cargo vessel (granted Apr. 17, 1973), https://www.google.com/patents/US3727571.
[56] ExxonMobil Research Engineering Co., Patent US3745960A: Tanker vessel (granted July 17, 1973), https://www.google.com/patents/US3745960.
[57] Chevron Research & Technology Co., Patent US3831385A: Arctic offshore platform (granted Aug. 27, 1974), https://www.google.com/patents/US3831385.
[58] Texaco Inc., Patent US3793840A: Mobile, arctic drilling and production platform (granted Feb. 26, 1974), https://www.google.com/patents/US3793840.
[59] Shell Oil Co., Patent US4427320A: Arctic offshore platform (granted Jan. 24, 1984), https://www.google.com/patents/US4427320.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

platform was originally designed to stand approximately 100 feet above sea level—the amount necessary to stay above waves in a once-in-a-century strength storm. However, Shell engineers revised their plans to increase the above-water height of the platform by 3 to 6 feet, specifically to account for higher anticipated average sea levels and increased storm intensity due to global warming over the platform's operational life. Raising the platform cost Shell an additional forty million dollars.[60]

4.53.   In the mid-1990s, ExxonMobil, Shell, and Imperial Oil (ExxonMobil) jointly undertook an offshore drilling project in Nova Scotia. According to the project's Environmental Impact Statement, the project estimated a "global warming sea-level rise" impact of 0.5 m [1.64 feet] during the 25-year life of the project. Exxon and Shell designed their coastal and offshore structures accordingly.[61]

4.54.   Defendants did not engage in climate research to benefit, educate, or warn the public. Defendants engaged in this research to protect their business interests. Defendants recognized decades ago that carbon emissions from fossil fuels were concentrating in the atmosphere and that this would lead to massive warming and catastrophic climate disruption. Defendants also recognized that increasing public awareness of the problem threatened their market share and profits and could lead to the development of competing alternative energy source and reduced demand for fossil fuels. Accordingly, as described in this Part B and in Part

---

[60] *Id.*; Lieberman, Amy and Susanne Rust. Big Oil braced for global warming while it fought regulations. (Dec. 31, 2015) https://graphics.latimes.com/oil-operations/
[61] ExxonMobil, Sable Project Development Plan, vol. 3, 4-77, http://soep.com/about-the-project/development-plan-application.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **34** of 98

C below, Defendants did not warn consumers of the dangers of Defendants' products. Rather, they actively engaged in disinformation and concealed the risks they well understood.

**C.**  **Defendants chose to deceive the public, and risk catastrophic climate change, in order to continue profiting from fossil fuels.**

4.55.   Once the public began to learn of the risks from using fossil fuels—risks that Defendants already knew—Defendants chose to deceive the public about climate change and the impact of fossil fuels. Defendants did this in order to maintain and increase demand for fossil fuels, limit demand for competing energy options, and increase their profits.

4.56.   Several events in the late 1980s and early 1990s led to greater public awareness of climate change:

a.      In 1988, NASA scientist James Hansen testified to Congress that human activities were causing global warming.[62] The testimony was widely publicized, including coverage on the front page of The New York Times.

b.      Also in 1988, the United Nations formed the Intergovernmental Panel on Climate Change ("IPCC"), a scientific panel charged with assessing available scientific information on climate change, its impacts, and potential response strategies.[63]

c.      The IPCC issued its first report in 1990 and a supplement in 1992. The IPCC concluded that "emissions from human activities are substantially increasing the atmospheric concentrations of greenhouse gases." Burning fossil fuels was responsible for 70-

---

[62] See Peter C. Frumhoff et al., The Climate Responsibilities of Industrial Carbon Producers, 132 Climatic Change 161 (2015).
[63] Bruce, J. P. and A. T. Brough. Memorandum of Understanding Between the United Nations Environment Programme (UNEP) and the World Meteorological Association (WMO) on the Intergovernmental Panel on Climate Change (IPCC ). (1989). https://www.ipcc.ch/site/assets/uploads/2019/06/MOU_between_UNEP_and_WMO_on_IPCC -1989.pdf

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **35** of **98**

90% of those emissions. The increase in greenhouse gasses will warm the Earth's surface, leading to serious environmental damage. The IPCC found sufficient evidence of these risks to justify immediate "use of cleaner, more efficient energy sources with lower or no emissions of greenhouse gases."[64]

4.57.    In response, Defendants embarked on a campaign to discredit the science and deceive the public. Defendants' campaign focused on concealing, discrediting, and misrepresenting information that could reduce demand for fossil fuels or increase demand for alternative energy sources.

4.58.    Defendants acted independently and jointly through API and other associations such as the International Petroleum Industry Environmental Conservation Association, the Information Council for the Environment, the Global Climate Coalition, and the Global Climate Science Communications Team.

4.59.    Unearthed internal documents and admissions from former employees evince a deliberate strategy to mislead the public through direct misrepresentations to consumers through advertising and other publications and also through use of seemingly independent front groups and scientific spokespeople.

**D.     Defendants strategized to use seemingly independent technical sources in order to confuse and mislead consumers about the scientific evidence for climate change**

4.60.    In a secretly-recorded video from 2021, an Exxon executive admitted:

> "Did we aggressively fight against some of the science? Yes.

---

[64]    IPCC, Climate Change: The IPCC Scientific Assessment xi (1990), https://www.ipcc.ch/report/climate-change-the-ipcc-1990-and-1992-assessments.

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

"Did we join some of these shadow groups to work against some of the early efforts? Yes, that's true. There's nothing illegal about that.

"We were looking out for our investments. We were looking out for our shareholders."[65]

4.61.   In 1988, Joseph Carlson, an Exxon public affairs manager, stated in an internal memo that Exxon "is providing leadership through API in developing the petroleum industry position" on climate change.[66] The "Exxon Position" would be in part to:

EMPHASIZE THE UNCERTAINTY IN SCIENTIFIC CONCLUSIONS REGARDING THE POTEN-TIAL ENHANCED GREENHOUSE EFFECT.

RESIST THE OVERSTATEMENT AND SENSATIONALIZATION OF POTENTIAL GREENHOUSE EFFECT WHICH COULD LEAD TO NONECONOMIC DEVELOPMENT OF NONFOSSIL FUEL RESOURCES.

4.62.   In 2019, Professor Martin Hoffert, a physicist and Exxon consultant in the 1980s, testified to Congress about Exxon's "climate science denial program campaign," stating:

> [O]ur research [at Exxon] was consistent with findings of the United Nations Intergovernmental Panel on Climate Change on human impacts of fossil fuel burning, which is that they are increasingly having a perceptible influence on Earth's climate. . . . If anything, adverse climate change from elevated CO2 is proceeding faster than the average of the prior IPCC mild projections and fully consistent with what we knew back in the early 1980's at Exxon. . . . I was greatly distressed by the climate science denial program campaign that

---

[65] Brady, Jeff. Exxon Lobbyist Caught On Video Talking About Undermining Biden's Climate Push (July 1, 2021). https://www.npr.org/2021/07/01/1012138741/exxon-lobbyist-caught-on-video-talks-about-undermining-bidens-climate-push

[66] Memorandum from Joseph M. Carlson, The Greenhouse Effect (Aug. 3, 1988), https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-Greenhouse-Effect.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 37 of 98

Exxon's front office launched around the time I stopped working as a consultant—but not collaborator—for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this.[67]

4.63.   Defendants' tactics – e.g., outright denial, claiming uncertainty when there was in fact a scientific consensus, and secretly funding, then publicly promoting fringe scientific theories as evidence of a true scientific debate – mirrored the tactics that cigarette companies used to persuade consumers that smoking did not cause cancer.

4.64.   That Defendants employed tactics like those used by cigarette companies is no surprise – they hired many of the same consultants from the same public relations firms and, in some cases, used the very same front groups and scientists to act as spokespeople to mislead the public.

4.65.   Defendants formed the International Petroleum Industry Environmental Conservation Association to coordinate the industry's response to the public's growing awareness of climate change. Within the Association, Defendants participated in a "Working Group on Global Climate Change." In 1990, the Working Group sent a strategy memo to Defendants and hundreds of other oil companies. The memo explained that, to forestall a global shift away from burning fossil fuels for energy, the industry should emphasize uncertainties in

---

[67] Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change, Hearing Before the Subcomm. on Civil Rights and Civil Liberties of the Comm. on Oversight and Reform, 116th Cong. 7–8 (Oct. 23, 2019) (statement of Martin Hoffert, Former Exxon Consultant, Professor Emeritus, Physics, New York University), https://oversight.house.gov/hearing/subcommittee-on-civil-rights-climate-change/

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **38** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

climate science, call for further research, and promote industry-friendly policies that would leave the fossil-fuel business intact.[68]

4.66.    In 1991, the Information Council for the Environment, whose members included Defendants, launched a national climate change science denial campaign with full-page newspaper ads, radio commercials, a public relations tour schedule, "mailers," and research tools to measure campaign success. The campaign's top strategy was to:

# 1. Reposition global warming as theory (not fact).

Its target audiences included younger, lower-income women who "are likely to be 'green' consumers, to believe the earth is warming, and to think the problem is serious . . . These women are good targets for magazine advertisements."[69]

4.67.    The campaign planned to "use a spokesman from the scientific community" based on consumer research that found "technical and expert sources have the highest credibility among a broad range of members of the public." [70]

4.68.    In 1994, an internal Shell report similarly described its public relations plan to emphasize that:

---

[68] Benjamin A. Franta, Big Carbon's Strategic Response to Global Warming, 1950-2020 140 (2022), https://purl.stanford.edu/hq437ph9153.
[69] Union of Concerned Scientists, Deception Dossier #5: Coal's "Information Council on the Environment" Sham (1991), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf.
[70] Id.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **39** of 98

Scientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas emissions beyond 'no regrets' measures could be premature, divert resources from more pressing needs and further distort markets. [71]

4.69.   In 1998, API formed the Global Climate Science Communications Team, including representatives from Exxon, API, and Chevron. There were no scientists on the Science Communications Team. The Science Communications Team enlisted several Defendant-funded front groups to participate, as well as a front group created by cigarette-maker Phillip Morris, "The Advancement of Sound Science Coalition," and its executive director, Steve Milloy, to assist. Philip Morris had created and funded "The Advancement of Sound Science Coalition" to act as a seemingly more credible and independent voice to claim that second-hand smoke did not cause cancer or heart disease. API and Defendants paid  The Advancement of Sound Science Coalition and Steve Milloy, to spread doubt about climate science in the same way that it spread doubt about smoking and cancer.[72]

4.70.   The Global Climate Science Communications Team "developed an action plan to inform the American public that science does not support the precipitous actions Kyoto would dictate [i.e., reducing use of fossil fuels]." According to the plan:

---

[71] Shell Internationale Petroleum, Greenhouse Effect Working Group, The Greenhouse Effect (May 1988), https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239.

[72] Union of Concerned Scientists, Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science (July 16, 2007), https://www.ucsusa.org/resources/smoke-mirrors-hot-air.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **40** of 98

**<u>Victory Will Be Achieved When</u>**

- Average citizens "understand" (recognize) uncertainties in climate science; recognition of uncertainties becomes part of the "conventional wisdom"

- Media "understands" (recognizes) uncertainties in climate science.

- Media coverage reflects balance on climate science and recognition of the validity of viewpoints that challenge the current "conventional wisdom"

- Industry senior leadership understands uncertainties in climate science, making them stronger ambassadors to those who shape climate policy

- Those promoting the Kyoto treaty on the basis of extant science appear to be out of touch with reality.

4.71.   The Global Climate Science Communications Team would: "1. Develop and implement a national media relations program to inform the media about uncertainties in climate science to generate national, regional, and local media coverage on the scientific uncertainties," to be accomplished by the following (among other actions): "offer scientists to appear on radio talk shows across the country . . . Identify, recruit, and train a team of five independent scientists to participate in media outreach . . . Produce [and] distribute a steady stream" of climate science information and editorials "authored by scientists" to media outlets nationwide. The Science Communications Team would also "Organize, promote and conduct through grassroots organizations a series of campus/community workshops/debates on climate science."[73]

4.72.   The Communications Team also planned to create a "one-stop resource on climate science" for industry partners, as well as policymakers, the media, and "all others concerned." In particular, the resource center would provide the "<u>logistical and moral</u> support"

---

[73] Email from Joe Walker to Global Climate Science Team, <u>Draft Global Climate Science Communications Plan</u> (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 41 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

to enable industry partners to advocate for protecting fossil fuel markets based on alleged uncertainties in climate science.[74]

4.73.   Soon after, API distributed a memo to its members stating: "Climate is at the center of industry's business interests. Policies limiting carbon emissions reduce petroleum product use. That is why it is API's highest priority issue and defined as strategic."[75]

4.74.   On information and belief, Defendants and API engaged in deceiving the public about climate change intended to do so not just to influence policy, but also to ensure continued consumer demand for fossil fuels and avoid competition from cleaner energy sources.

---

[74] Email from Joe Walker to Global Climate Science Team, Draft Global Climate Science Communications Plan (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.
[75] Allegations of Political Interference with Government Climate Change Science, Hearing Before the Comm. on Oversight and Government Reform, 110th Cong. 324 (Mar. 19, 2007) https://www.govinfo.gov/content/pkg/CHRG-110hhrg37415/html/CHRG-110hhrg37415.htm

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **42** of 98

**E.    Defendants spread their deceptive messages to consumers in part through advertisements and other publications.**

4.75.   Below are some of the Information Council for the Environment's advertisements:[76]



**Figure 6:** Information Council for the Environment Advertisements

4.76.   For over a decade, Mobil (ExxonMobil) regularly published advertisements in the New York Times and other national newspapers. These advertisements were meant to look like editorials, not paid advertisements. In line with Defendants' strategy, many such "advertorials" claimed the science of climate change was uncertain or lacking evidence.

4.77.   Mobil ran the following advertorial in the New York Times in 1993:

---

[76] Union of Concerned Scientists, Deception Dossier #5: Coal's "Information Council on the Environment" Sham at 47-49 (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

1
2

# Apocalypse no

For the first half of 1992, America was inundated by the media with dire predictions of global warming catastrophes, all of which seemed to be aimed at heating up the rhetoric from the Earth Summit in Rio de Janeiro last June.

Unfortunately, the media hype proclaiming that the sky was falling did not properly portray the consensus of the scientific community. After the Earth Summit, there was a noticeable lack of evidence of the sky actually falling and subsequent colder than normal temperatures across the country cooled the warming hysteria as well.

Everybody, of course, remembers the Earth Summit and the tons of paper used up in reporting on it — paper now buried in landfills around the world. But few people ever heard of a major document issued at the same time and called the "Heidelberg Appeal." The reason? It just didn't make "news."

Perhaps that is because the Appeal urged Summit attendees to avoid making important environmental decisions based on "pseudo-scientific arguments or false and non-relevant data."

The Heidelberg Appeal was issued initially by some 264 scientists from around the world, including 52 Nobel Prize winners. Today, the Appeal carries the signatures of more than 2,300 scientists — 65 of them Nobel Prize winners—from 79 countries. If nothing else, its message is illustrative of what's wrong with so much of the global warming rhetoric. The lack of solid scientific data.

Scientists can agree on certain facts pertaining to global warming. First, the greenhouse effect is a natural phenomenon; it accounts for the moderate temperature that makes our planet habitable. Second, the concentration of greenhouse gases (mainly carbon dioxide) has increased and there has been a slight increase in global temperatures over the past century. Finally, if present trends continue, carbon dioxide levels will double over the next 50 to 100 years.

Controversy arises when trying to link past changes in temperatures to increased concentrations of greenhouse gases. And it arises again when climate prediction models are used to conclude Earth's temperature will climb drastically in the next century and—based on such models—to propose policy decisions that could drastically affect the economy.

According to Arizona State University climatologist Dr. Robert C. Balling in his book, The Heated Debate (San Francisco: Pacific Research Institute for Public Policy, 1992), until knowledge of the interplay between oceans and the atmosphere improves, "model predictions must be treated with considerable caution." Moreover, models don't simulate the complexity of clouds, nor do they deal adequately with sea ice, snow or changes in intensity of the sun's energy.

And they don't stand up to reality testing. Comparing actual temperatures over the last 100 years against model calculations, the models predicted temperature increases higher than those that actually occurred. Moreover, most of the earth's temperature increase over the last century occurred before 1940. Yet, the real build-up in man-made $CO_2$ didn't occur until after 1940. Temperatures actually fell between 1940 and 1970.

Sifting through such data, Dr. Balling has concluded, "there is a large amount of empirical evidence suggesting that the apocalyptic vision is in error and that the highly touted greenhouse disaster is most improbable."

Other scientists have an even more interesting viewpoint. Notes atmospheric physicist S. Fred Singer, president of the Washington, D.C.-based Science & Environmental Policy Project, "the net impact [of a modest warming] may well be beneficial."

All of which would seem to suggest that the jury's still out on whether drastic steps to curb $CO_2$ emissions are needed. It would seem that the phenomenon — and its impact on the economy — are important enough to warrant considerably more research before proposing actions we may later regret.

Perhaps the sky isn't falling, after all.



Mobil

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 44 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

53

4.78.    The advertorial quotes Fred Singer, a physicist whom tobacco companies funded to promote his claim that second-hand smoke did not cause cancer.[77]

4.79.    On information and belief, Defendants financially supported Fred Singer and his writings, though the advertisement presents Singer as a neutral expert.

4.80.    The advertisement also presents Robert C. Balling as another neutral scientific expert. Yet five years after Mobil ran this advertorial, Balling acknowledged that he had received $408,000 in funding from the fossil fuel industry, including from ExxonMobil.[78]

4.81.    The advertorial misleadingly portrays the "Heidelberg Appeal" as evidence that there was insufficient scientific data for action on climate change. In fact, the Heidelberg Appeal did not discuss climate change or the validity of scientific reasoning or evidence showing that climate change is happening, is human-caused, and will cause severe environmental damage.[79]

4.82.    Many other Exxon and Mobil advertorials falsely or misleadingly characterized the state of climate science research. Below are examples of statements appearing in Exon and Mobil advertisements:

a.    "We don't know enough about the factors that affect global warming and the degree to which—if any—that man-made emissions (namely, carbon dioxide) contribute to increases in Earth's temperature."[80]

---

[77] Schwartz, John. S. Fred Singer, a Leading Climate Change Contrarian, Dies at 95. Derided as a "Merchant of Doubt," he spent decades trying to refute the evidence of global warming and other environmental risks. (April 11, 2020). https://www.nytimes.com/2020/04/11/climate/s-fred-singer-dead.html.
[78] Robert C. Balling Jr. DeSmog. https://www.desmog.com/robert-c-balling-jr/.
[79] Heidelberg Appeal. DeSmog. https://www.desmog.com/heidelberg-appeal/.
[80] Mobil, Climate Change: A Prudent Approach, in N.Y. Times (Nov. 13, 1997), https://www.documentcloud.org/documents/705548-mob-nyt-1997-11-13-climateprudentapproach.html.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 45 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

b.      "[G]reenhouse-gas emissions, which have a warming effect, are offset by another combustion product—particulates—which leads to cooling."[81]

c.      "Even after two decades of progress, climatologists are still uncertain how—or even if—the buildup of man-made greenhouse gases is linked to global warming. It could be at least a decade before climate models will be able to link greenhouse warming unambiguously to human actions. Important answers on the science lie ahead."[82]

d.      "[I]t is impossible for scientists to attribute the recent small surface temperature increases to human causes."[83]

4.83.    A quantitative analysis of ExxonMobil's climate communications between 1989 and 2004 found that, while 83% of the company's peer-reviewed papers and 80% of its internal documents acknowledged the reality and human origins of climate change, 81% of its advertorials communicated doubt about those conclusions.[84]

4.84.    In 1996, Exxon published a pamphlet, "Global Warming: Who's Right? Facts about a debate that's turned up more questions than answers." False or misleading statements in the pamphlet include the following: In the preface, Exxon's CEO stated that "many scientists

---

[81]   Mobil, Less Heat, More Light on Climate Change (July 18, 1996), https://www.documentcloud.org/documents/705544-mob-nyt-1996-jul-18-lessheatmorelight.html.

[82]   Mobil, Climate Change: Where We Come Out, in N.Y. Times (Nov. 20, 1997), https://www.documentcloud.org/documents/705549-mob-nyt-1997-11-20-ccwherewecomeout.html.

[83]   ExxonMobil, Unsettled Science (Mar. 23, 2000), reproduced in https://www.theguardian.com/environment/2021/nov/18/the-forgotten-oil-ads-that-told-us-climate-change-was-nothing.

[84]   Geoffrey Supran & Naomi Oreskes, Assessing ExxonMobil's Climate Change Communications (1977–2014), 12 Envtl. Research Letters, IOP Publishing Ltd. 12 (2017), https://iopscience.iop.org/article/10.1088/1748-9326/aa815f/pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 46 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

agree there's ample time to better understand the climate system." The pamphlet misleadingly described the greenhouse effect, calling it "definitely a good thing" and "what makes the earth's atmosphere liveable" without mentioning the severe damage that the greenhouse effect could cause if carbon levels continued to rise. Contradicting Exxon's internal and peer-reviewed scientific research, the pamphlet ascribed the rise in temperature since the late nineteenth century to "natural fluctuations that occur over long periods of time" rather than to burning fossil fuels. The publication also falsely claimed that models projecting future impacts to the climate from rising carbon levels, including those developed by Exxon employees, as having been "proved to be inaccurate." Further, the pamphlet claimed "the indications are that a warmer world would be far more benign than many imagine . . . moderate warming would reduce mortality rates in the US, so a slightly warmer climate would be more healthful." Exxon further claimed that advocates for reducing fossil fuel use were simply "drawing on bad science, faulty logic, or unrealistic assumptions," without disclosing that Exxon's own research supported those advocates' claims.[85]

4.85. Also in 1996, API published the book *Reinventing Energy: Making the Right Choices* claiming "there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil." "[N]o scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of

---

[85] Exxon Corp., Global Warming: Who's Right? (1996). https://www.climatefiles.com/exxonmobil/global-warming-who-is-right-1996/

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **47** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

storms." "Facts don't support the arguments for restraining oil use."[86],[87] API claimed that scientists do not understand how carbon flows in and out of the atmosphere or whether fossil fuels are responsible for increasing concentrations of atmospheric $CO_2$. It then explained that even if some warming does occur, such warming "would present few if any problems." For example, farmers could be "smart enough to change their crop plans" and low-lying areas would "likely adapt" to sea-level rise.[88]

   4.86.   Defendants shared these talking points with other members of the fossil fuel industry. In a 1997 speech to the World Petroleum Congress, Exxon's CEO claimed:

> We also have to keep in mind that most of the greenhouse effect comes from natural sources . . . Leaping to radically cut this tiny sliver of the greenhouse pie on the premise that it will affect climate defies common sense and lacks foundation in our current understanding of the climate system.

> Let's agree there's a lot we really don't know about how climate will change in the 21st century and beyond . . . It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now.[89]

   4.87.   In a 1998 publication from Imperial Oil (ExxonMobil), "A Cleaner Canada," Imperial's CEO publicly claimed:

> There is absolutely no agreement among climatologists on whether or not the planet is getting warmer, or, if it is, on whether the warming is

---

[86] Sally Brain Gentille et al., Reinventing Energy: Making the Right Choices, American Petroleum Institute (1996), http://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy.
[87] American Petroleum Institute, Reinventing Energy: Making the Right Choices 79 (1996), http://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy.
[88] Id. at 86–87.
[89] Lee R. Raymond, Chairman and Chief Executive Officer, Exxon Corp., Address at the World Petroleum Congress (Oct. 13, 1997), https://www.climatefiles.com/exxonmobil/1997-exxon-lee-raymond-speech-at-world-petroleum-congress/.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **48** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

the result of man-made factors or natural variations in the climate. . .
. I feel very safe in saying that the view that burning fossil fuels will
result in global climate change remains an unproved hypothesis.[90]

**F.     Defendants funded and promoted seemingly independent scientists and groups to deceive the public about climate change.**

4.88.   Defendants also participated in the Global Climate Coalition ("GCC"), an industry group formed in 1989 to advertise and distribute material to encourage continued consumption of fossil fuels.[91] The Coalition's position on climate change was that "the preponderance of the evidence indicates that most, if not all, of the observed warming is part of [a] natural warming trend which began approximately 400 years ago. If there is [a human-caused] component to this observed warming, the GCC believes that it must be very small and must be superimposed on a much larger natural warming trend."[92]

4.89.   Despite what the Global Climate Coalition said publicly, it acknowledged internally that the alternative theories were unfounded. A draft version of the Coalition's "primer" on climate science acknowledged that various "contrarian theories" (i.e., climate change skepticism) do not "offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change," but this section was deleted from the public

---

[90]     Robert Peterson, A Cleaner Canada in Imperial Oil Review (1998), https://www.climatefiles.com/exxonmobil/imperial-oil/1998-imperial-oil-article-a-cleaner-canada-by-robert-peterson/.
[91] Id.
[92] Global Climate Coalition, Global Climate Coalition: An Overview 2 (Nov. 1996), http://www.climatefiles.com/denial-groups/global-climatecoalition-collection/1996-global-climate-coalition-overview/.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **49** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

1

2

version.[93] Instead, Defendants and the Coalition funded and promoted some of those same

contrarian theories.

3

4

5

6

    4.90.   Between 1989 and 1998, the Global Climate Coalition spent $13 million on

advertisements as part of a campaign to deceive the public about the scientific support for climate

change.[94]

7

8

9

10

11

    4.91.   In a 1994 report, the Global Climate Coalition falsely stated that "observations

have not yet confirmed evidence of global warming that can be attributed to human activities,"

that "[t]he claim that serious impacts from climate change have occurred or will occur in the

future simply has not been proven," so "there is no basis for the design of effective policy action

that would eliminate the potential for climate change."[95]

12

13

14

15

    4.92.   In 1995, the Global Climate Coalition published a booklet called "Climate

Change: Your Passport to the Facts," which falsely stated, "[w]hile many warnings have reached

the popular press about the consequences of a potential man-made warming of the Earth's

16

17

18

19

20

21

22

23

24

25

26

---

[93] Memorandum from Gregory J. Dana, Assoc. of Int'l Auto. Mfrs., to AIAM Technical Committee, Global Climate Coalition (GCC) - Primer on Climate Change Science - Final Draft (Jan. 18, 1996), https://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-7_GCC-Climate-Primer.pdf.

[94] Wendy E. Franz, Kennedy School of Government, Harvard University, Science, Skeptics and Non-State Actors in the Greenhouse, ENRP Discussion Paper E-98-18 13 (Sept. 1998), https://www.belfercenter.org/sites/default/files/legacy/files/Science%20Skeptics%20and%20Non-State%20Actors%20in%20the%20Greenhouse%20-%20E-98-18.pdf.

[95] GCC, Issues and Options: Potential Global Climate Change, Climate Files (1994), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1994-potential-global-climate-change-issues.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 50 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

1    atmosphere during the next 100 years, there remains no scientific evidence that such a dangerous

2    warming will actually occur."[96]

3      4.93.  In 1997, William O'Keefe, chairman of the Global Climate Coalition and

4    executive vice president of API, wrote in a Washington Post op-ed, "[c]limate scientists don't

5    say that burning oil, gas, and coal is steadily warming the earth."[97]

6

7      4.94.  The Global Climate Coalition also sought to undermine credible climate science.

8    When the IPCC concluded that burning fossil fuels was likely influencing the climate, the Global

9    Climate Coalition responded by falsely and misleadingly claiming that the IPCC's report was

10   the product of "scientific cleansing" that "understate[d] uncertainties about climate change

11   causes and effect . . . to increase the apparent scientific support for attribution of changes to

12   climate to human activities."[98]  The Coalition promoted this claim to reporters, editors of

13   scientific journals, and the readership of national newspapers.[99]  The Coalition's effort "was

14

15

16

17

18

---

[96] GCC, Climate Change: Your Passport to the Facts, Climate Files (1995), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1995-climate-change-facts-passport.

[97] William O'Keefe, A Climate Policy, in The Washington Post (July 5, 1997), https://www.washingtonpost.com/archive/opinions/1997/07/05/a-climate-policy/6a11899a-c020-4d59-a185-b0e7eebf19cc/.

[98] Franz, Science, Skeptics and Non-State Actors in the Greenhouse at 14. https://www.belfercenter.org/sites/default/files/legacy/files/Science%20Skeptics%20and%20Non-State%20Actors%20in%20the%20Greenhouse%20-%20E-98-18.pdf.

[99] Naomi Oreskes & Erik Conway, Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming, New York: Bloomsbury Press 205–13 (2011). See also S. Fred Singer, Climate Change and Consensus, Science vol. 271, no. 5249 (Feb. 2, 1996); Frederick Seitz, A Major Deception on 'Global Warming', Wall Street Journal (June 12, 1996).

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 51 of 98

widely perceived to be an attempt on the part of the [Global Climate Coalition] to undermine the credibility of the IPCC."[100]

4.95.   In 1998, a multi-state lawsuit against four of the largest tobacco companies for deceiving the public about whether smoking caused cancer settled for 365.5 billion dollars.[101] Defendants took note. As one Shell employee explained, the company "didn't want to fall into the same trap as the tobacco companies who have become trapped in all their lies."[102]

4.96.   In response, Defendants shifted their communications strategy from outright denial of climate science to delay.[103] Defendants increasingly claimed that even if the climate "risk" was real, lingering uncertainties in the science did not justify the alleged exorbitant costs of reducing fossil fuel consumption.

4.97.   Defendants also relied more on front groups and seemingly independent scientists to promote their deceptive messages.

4.98.   BP and Shell publicly left the Global Climate Coalition, but remained members of API, who continued to participate in the Global Climate Coalition on behalf of BP, Shell, and API's other members.

---

[100]Franz, Science, Skeptics, and Non-State Actors in the Greenhouse at 15. https://www.belfercenter.org/sites/default/files/legacy/files/Science%20Skeptics%20and%20Non-State%20Actors%20in%20the%20Greenhouse%20-%20E-98-18.pdf
[101]      https://www.naag.org/our-work/naag-center-for-tobacco-and-public-health/the-master-settlement-agreement/.
[102] Nathaniel Rich, Losing Earth: A Recent History, London: Picador 186 (2020).
[103]Franta, Big Carbon's Strategic Response to Global Warming, 1950-2020 at 170. https://stacks.stanford.edu/file/druid:hq437ph9153/Franta%20-%20Big%20Carbon%20strategic%20response%20to%20global%20warming%201950-2020%20-%202022-08-25-augmented.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 52 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

61

4.99.    Defendants have funded dozens of think tanks, front groups, and foundations to promote doubt on whether fossil fuels caused climate change, or whether climate change was a serious problem. In many cases, the funds were earmarked for climate change programs and constituted a substantial share of the group's budget. These include the Competitive Enterprise Institute, the Heartland Institute, Frontiers for Freedom, and the Committee for a Constructive Tomorrow. Many of these organizations have an overlapping—sometimes identical—collection of spokespeople serving as staff, board members, and scientific advisors. Funding multiple organizations with overlapping staff and spokespeople to spread the same message created a deceptive impression that a broad platform of experts and grassroots organizations supported Defendants' views.[104]

4.100.   From 1998 to 2014, ExxonMobil spent almost $31 million funding numerous organizations misrepresenting the scientific consensus that fossil fuels were causing climate change with severe consequences for the public.[105]

4.101.   In 2007, Exxon publicly reported: "In 2008, we will discontinue contributions to several public policy research groups whose position on climate change could divert attention from the important discussion on how the world will secure the energy required for economic

[104] Smoke, Mirrors & Hot Air, How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science., Union of Concerned Scientists, January, 2007. exxon_report.pdf (ucsusa.org).
[105] https://www.greenpeace.org/usa/fighting-climate-chaos/exxon-and-the-oil-industry-knew-about-climate-crisis/exxons-climate-denial-history-a-timeline/#:~:text=Analysis%20of%20ExxonMobil%20Worldwide%20Contributions,and%20Union%20of%20Concerned%20Scientists.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **53** of 98

growth in an environmentally responsible manner."[106] While Exxon acknowledged that funding climate denial was affecting the public debate on climate change, Exxon did not keep its promise to stop. Exxon continued to support groups denying climate science in 2008 and beyond.

4.102.  Several Defendants have been linked to other groups that undermine the scientific basis linking fossil fuels to climate change and sea-level rise, including the Frontiers of Freedom Institute and the George C. Marshall Institute.

4.103.  Phillip Cooney, an attorney at API from 1996 to 2001, testified at a 2007 Congressional hearing that it was "typical" for API to fund think tanks and advocacy groups that minimized fossil fuels' role in climate change. Among the groups to which API provided funding were the Heartland Institute, Competitive Enterprise Institute, and the American Council on Capital Formation, each of which issued publications challenging the scientific consensus that fossil fuels were causing climate change and opposing restrictions on Defendants' extraction, production, and sale of fossil fuels.[107]

4.104.  Defendants also paid scientists to research alternative causes of climate change and promote fringe theories that lacked substantial evidence or support. Those scientists obtained all or part of their research budget from Defendants directly or through Defendant-funded

---

[106]ExxonMobil, 2007 Corporate Citizenship Report 41 (Dec. 31, 2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html.
[107] Id.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 54 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

organizations like API.[108] They frequently failed to disclose their fossil fuel industry underwriters, at times violating the ethical protocols of journals they published in.[109]

4.105.  Defendant-funded front groups and API then promoted the research from the scientists Defendants had secretly funded, leading consumers to believe that the scientists were neutral experts unconnected to Defendants and that a wide variety of organizations accepted their views.

4.106.  For example, in 2003, scientists Wei-Hock Soon and Sallie Baliunas published a paper claiming the twentieth century was not the warmest century of the past 1,000 years and that the climate had not changed significantly over that period. The paper acknowledged that API funds supported their research.

4.107.  Soon received substantial funding from Exxon and API throughout his career. Soon also had contractually agreed to allow his donors to review his research before publication which he at times referred to as "deliverables." His housing institution also agreed not to disclose the arrangement without prior permission from his fossil fuel donors.[110]

---

[108] E.g., Willie Soon & Sallie Baliunas, Proxy Climatic and Environmental Changes of the Past 1000 Years, 23 Climate Rsch. 88, 105 (Jan. 31, 2003), http://www.int-res.com/articles/cr2003/23/c023p089.pdf.

[109] E.g., Smithsonian Statement: Dr. Wei-Hock (Willie) Soon, Smithsonian (Feb. 26, 2015), https://web.archive.org/web/20181105223030/https://www.si.edu/newsdesk/releases/smithsonian-statement-dr-wei-hock-willie-soon.

[110] Union of Concerned Scientists, Climate Deception Dossier #1: Dr. Wei-Hock Soon's Smithsonian Contracts, (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf [https://perma.cc/JL2V-XYGL] & https://s3.amazonaws.com/ucs-documents/global-warming/Climate-Deception-Dossier-1_Willie-Soon.pdf; https://www.ucsusa.org/resources/climate-deception-dossiers.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 55 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

4.108. Baliunas and Soon were formally affiliated with numerous front groups that Defendants funded, including the Global Climate Coalition, the George Marshall Institute, the Competitive Enterprise Institute, the Heartland Institute, Tech Central Station, the Center for Science and Public Policy, an affiliate of Frontiers of Freedom, and the Committee for a Constructive Tomorrow.[111]

4.109. After Soon and Baliunas published their 2003 paper, Defendant-funded front groups quickly promoted their work as neutral expert opinion on the uncertainty of climate science. One such promotion was published in the Seattle Post-Intelligencer by William O'Keefe. Significantly, William O'Keefe's employment rotated between API, the Global Climate Coalition, the Marshall Institute, and the Competitive Enterprise Institute---all groups that Defendants helped to form and/or fund. O'Keefe has also been a registered lobbyist for Exxon and API.[112]

4.110. Following Soon and Baliunas' 2003 publication, three editors of the scientific journal wherein it was published resigned, criticizing the journal's review process as insufficiently rigorous and claiming Soon and Baliunas' cited evidence did not support their conclusions. Thirteen of the scientists cited in Soon and Baliunas' paper published a rebuttal

---

[111] Sallie Baliunas. DeSmog. https://www.desmog.com/sallie-baliunas/#s26 _; Willie Soon. DeSmog. https://www.desmog.com/willie-soon/.
[112] Union of Concerned Scientists, Climate Deception Dossier #1: Dr. Wei-Hock Soon's Smithsonian Contracts, (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf [https://perma.cc/JL2V-XYGL] & https://s3.amazonaws.com/ucs-documents/global-warming/Climate-Deception-Dossier-1_Willie-Soon.pdf; O'Keefe, W., 2003, Global warming an uncertainty, Seattle Post-Intelligencer, December 12;
William O'Keefe. DeSmog. https://www.desmog.com/william-o-keefe/.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 56 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

explaining that Soon and Baliunas had seriously misinterpreted their research.[113] William O'Keefe and the other Defendant-funded front groups publicly promoting Soon and Balinuas' 2003 paper did not disclose this controversy, their financial support for Soon and Baliunas' work, or their own connections to Defendants.

4.111. In addition to misleading the public about climate change, Defendants did not warn consumers of the known risks of using fossil fuels and the potential for catastrophic damage to public health, natural resources, and economies. Defendants also concealed their strategic collaborations with other companies and their support for seemingly independent third parties, further misleading the public.

4.112. Much of Defendants' deceptive activity and sophisticated understanding of climate change was not publicly discovered until journalists uncovered confidential industry documents and interviewed former employees beginning in 2015.[114]

---

[113] Union of Concerned Scientists. Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science. (Jan. 2007), https://www.ucsusa.org/sites/default/files/2019-09/exxon_report.pdfnn. 82-83.

[114] Neela Banerjee et al., Exxon: The Road Not Taken, InsideClimate News (Sept. 16, 2015), https://insideclimatenews.org/content/Exxon-The-Road-Not-Taken; the Los Angeles Times published a series of three articles between October and December 2015: see Katie Jennings et al., How Exxon went from leader to skeptic on climate change research, L.A. Times (Oct. 23, 2015), https://graphics.latimes.com/exxon-research; Sara Jerving et al., What Exxon knew about the Earth's melting Arctic, L.A. Times (Oct. 9, 2015), https://graphics.latimes.com/exxon-arctic/; Amy Lieberman & Susanne Rust, Big Oil braced for global warming while it fought regulations, L.A. Times (Dec. 31, 2015), https://graphics.latimes.com/oil-operations; Caroll Muffett & Steven Feit, Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis, Ctr. for Int'l Envtl. Law 10 (2017), https://www.ciel.org/reports/smoke-and-fumes.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 57 of 98

66

**G.     Defendants continue to deceive the public by failing to disclose the impact of fossil fuels on climate change, claiming their products reduce greenhouse gas emissions, promoting unproven technologies, and greenwashing.**

4.113. While Defendants' deceptive campaign began as a campaign to deny or manufacture doubt about the role of fossil fuels in changing the climate, Defendants have adjusted their messages over time. The one constant, however, is that Defendants continue to mislead about relevant facts in order to foster continued demand for fossil fuels and dampen demand for clean energy alternatives.

4.114. Defendants:

a.     Still do not disclose the impact of fossil fuels on climate change;

b.     Promote fossil fuel products as "green," "sustainable," "carbon-neutral," and "lowering emissions;"

c.     Promote unrealistic or unproven technologies that would permit continued reliance on fossil fuels and fossil-fuel-based cars, heating, and electricity; and

d.     Promote themselves as clean energy companies who are actively working to achieve net-zero emissions.

4.115. Defendants' advertising is pervasive. Defendants reach the public through television, news, podcasts, online ads, Google searches, social media posts, YouTube videos, and through messaging from seemingly independent third parties (that are, in reality, closely connected to Defendants). Further, Defendants employ messaging strategies that amplify and maximize their influence on consumers and the public.

4.116. All of this serves a common end: giving consumers the impression that climate change is not a serious concern and, in any event, that Defendants are clean energy companies

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **58** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

who will solve climate change with "advanced" fossil fuels, new technologies, and reducing emissions.

4.117. Defendants' investments and business plans tell a different story. Defendants continue to explore for and produce increasing quantities of fossil fuels, to ensure dependence and to dampen demand for alternative energy sources and technologies. Reducing emissions is simply not in the business plan.[115]

4.118. Defendants' investments in clean energy are miniscule parts of their budgets and short-lived. Further, Defendants' commitment to this research is generally insufficient to achieve a transition away from fossil fuel dependence that Defendants claim in their ads to pursue.

**H.    Defendants fail to disclose the climate impacts of their fossil fuel products.**

4.119. Defendants have spent fortunes deceiving the public about climate change and the harms and costs it imposes on public health, the economy, and natural resources, so as to protect their "core business" operations:  selling more and more fossil fuels.  That deception continues to this day.

---

[115] For example, ConocoPhillips' 2012 10-K SEC filing reveals the company's sole focus on producing fossil fuels for global distribution: "As an independent E&P company, we are solely focused on our core business of exploring for, developing and producing crude oil and natural gas globally." The filing further highlighted the company's "growing North American shale and oil sands businesses . . . and a global exploration program." ConocoPhillips, Annual Report (Form10-K)                    32                    (Dec.                    31,                    2012), https://www.sec.gov/Archives/edgar/data/1163165/000119312513065426/d452384d10k.htm. Indeed, in 2019, ConocoPhillips produced over 700,000 of barrels of crude oil per day and over 2.8 million cubic feet of natural gas per day.  ConocoPhillips, 2019 Annual Report 168 (2019), https://static.conocophillips.com/files/resources/2019-conocophillips-annual-report-19-0895.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **59** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

4.120. This disinformation affects consumer choices about all manner of decisions, including for example transportation, heating and cooling, building construction, appliances, travel, and recreation.

4.121. History shows that when people are made aware of the harmful effects or qualities of products they purchase, they often choose not to purchase them or to reduce their purchases. Awareness of such effects can also spur new markets for more environmentally friendly products.

4.122. For example, increased consumer awareness of the role of pesticides in harming human health, worker health, and the environment spurred a burgeoning market for food grown organically—with access to information about how their food was grown, consumers demanded healthier choices, and the market responded.

4.123. Consumers also responded swiftly to findings that the use of products like hairsprays and deodorants with chlorofluorocarbon ("CFC") containing aerosols were depleting the earth's protective ozone layer by purchasing substitutes for CFC-containing products.

4.124. As a BP executive stated in an internal memo from 2016:

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **60** of 98

### 1.1.1 Risks to BP from climate change

The climate problem has the potential to disrupt BP's business in at least three ways:

i. Effective climate policies can emerge that discourage fossil fuel consumption, that impose environmental performance standards on production processes, and that subsidize or promote efficiency and low carbon energy.

ii. Climate-motivated research can create disruptive new energy technology.

iii. Climate impacts can directly disrupt BP's investments in energy production infrastructure and supply chains. [116]

4.125. By omitting material information about the climate impacts of their fossil fuel products, Defendants continue to profit from their decades-long deceptive campaign and ongoing uncertainty among the consuming public regarding the role of fossil fuels in harming people, the economy, and the environment.

**I.   Defendants misleadingly promote fossil fuel products as "green," "sustainable," "carbon-neutral," and "lowering emissions."**

4.126. Defendants also advertise fossil fuel products as "environmentally friendly," "green," "sustainable," "carbon-neutral" and "lowering emissions." These claims deceptively state and imply environmental benefits that are non-existent or negligible.

4.127. In 2017, the Dutch Advertising Code Authority censured Shell and Exxon for advertising natural gas as the "cleanest fossil fuel." The Advertising Code Authority reasoned that the claim "suggested that fossil fuels can be clean in that they do not cause environmental

---

[116] BP. Issues Management Working Group Meeting Notes; Caspian 4.53. (Sept. 25, 2017) https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2022/BP_Redacted-Final-1.pdf p.104

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **61** of 98

1   damage. It is firm . . . that that suggestion is not correct."[117] Yet in the United States, all

2   Defendants continue to advertise natural gas as clean, sustainable, environmentally-friendly, and

3   low-emission.

4        4.128.  For example, Shell has published numerous advertisements on national

5   newspapers such as the New York Times and the Washington Post in which the company touts

6   its investments in new energy sources to reduce emissions and help to "set[] the course" for a

7   "lower-carbon mobility future." In these advertisements, Shell presents liquefied natural gas as

8   a "cleaner source" of energy and "a critical component of a sustainable energy mix" and a

9   "lower-carbon fuel" that could "help decrease" $CO_2$ emissions.[118],[119]

10       4.129.  ConocoPhillips has released ads on Facebook stating, "Natural Gas: efficient,

11  affordable, environmentally-friendly. Find out how natural gas is meeting global energy demand

12  while reducing climate-related risks," and linking to a page on their website.[120]

13       4.130.  In 2008 ConocoPhillips published this full-page ad in *The Atlantic* magazine:

---

[117] Nelson, Arthur. Shell and Exxon face censure over claim gas was 'cleanest fossil fuel'. (Aug. 14, 2017) https://www.theguardian.com/environment/2017/aug/14/shell-and-exxon-face-censure-over-claim-gas-was-cleanest-fossil-fuel.

[118] See, e.g., The Making of Sustainable Mobility (Content from Shell), Wash. Post, https://www.washingtonpost.com/brand-studio/shell/the-making-of-sustainable-mobility.

[119] See, e.g., Moving Forward: A Path To Net-Zero Emissions By 2070 (Shell Paid Post), N.Y. Times, https://www.nytimes.com/paidpost/shell/ul/moving-forward-a-path-to-net-zero-emissions-by-2070.html.

[120] https://twitter.com/APIenergy/status/1325211486092845057.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **62** of **98**



**Figure 7:** ConocoPhillips advertisement in *The Atlantic*

4.131. Contrary to the impression these claims are intended to leave, natural gas is a fossil fuel that contributes substantially to climate change. It emits significant quantities of $CO_2$ when burned and leaks methane throughout its lifecycle. Once methane leakages are considered, advantages of natural gas over other fossil fuels are reduced, if not eliminated. The IPCC

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 63 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

estimates that methane alone is responsible for more than a third of the warming the Earth has experienced thus far.

4.132.  Defendants also misleadingly market certain gasolines, motor oils, and lubricants as "green," "carbon-neutral," "environmentally-friendly," or "lowering emissions." These claims imply that Defendants' products are beneficial to the climate and can help reduce emissions. In reality, burning these fossil fuel products will increase emissions and worsen climate change, and any comparative benefit from using Defendants' products as opposed to another motor oil, gasoline, or lubricant is negligible.

4.133.  For example, Chevron advertised its Techron fuel with claims that emphasize its supposed positive environmental qualities, such as: "less is more," "minimizing emissions," and "up to 50% cleaner."[121]  In a Q and A on Chevron's website, one question says, "I care for the environment.  Does Techron impact my car's emissions?" Chevron answers that "[g]asolines with Techron" clean up carburetors, fuel injectors, and intake valves, "giving you reduced emissions."[122]

4.134.  Shell advertised that its Shell Nitrogen Enriched Cleaning System and V-Power Nitro+ Premium "produce[s] fewer emissions" and that not using them can lead to "higher emissions."[123]

4.135.  Exxon advertises its Synergy Diesel Efficient fuel as the "latest breakthrough technology" and the "first diesel fuel widely available in the US" that helps "increase fuel

---

[121] See, e.g., Chevron, Techron, https://www.techron.com (last visited Oct. 14, 2022).
[122] Id.
[123] See, e.g., Shell, Shell Nitrogen Enriched Gasolines, https://www.shell.us/motorist/shell-fuels/shell-nitrogen-enriched-gasolines.html (last visited Oct. 14, 2022).

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **64** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

economy" and "[r]educe emissions and burn cleaner," and "was created to let you drive cleaner, smarter and longer."

4.136.  Exxon also publishes online content under the banner "Energy Factor," wherein Exxon claims that it is "develop[ing] safe and reliable energy sources for the future." The Energy Factor webpage includes posts such as "Green Motor Oil? ExxonMobil Scientists Deliver an Unexpected Solution," in which Exxon promotes its green-colored motor oil, with a heading in bold typeface advertising that it can "contribute to . . . carbon dioxide emission-reduction efforts."

4.137.  BP markets its Invigorate gasoline as a "cleaning agent that helps . . . give you more miles per tank," and "help[s] cars become clean, mean, driving machines," and its bp Diesel as "a powerful, reliable, and efficient fuel made" to help "reduce emissions."[124]

4.138.  BP's website advertises its fuel selection as "including a growing number of lower-carbon and carbon-neutral products."  BP's website also describes its Invigorate gasoline product as better than "ordinary fuels" that have problems like "increased emissions."

4.139.  ConocoPhillips, through its 76-branded gas stations in Washington, offers for sale and markets 76-brand fossil fuels. In ConocoPhillips's advertisements for its 76-brand fuels ConocoPhillips claims that its fuels "clean" a car's engine, resulting in "lower emissions, and that deposits left from other gasolines "can increase emissions." ConocoPhillips advertises that 76's fossil fuels are "better for the environment." The 76 website for 76's fuels contains the marketing materials shown below, in which ConocoPhillips makes the claim—superimposed on

---

[124] See, e.g., BP, Our Fuels, https://www.bp.com/en_us/united-states/home/products-and-services/fuels.html (last visited Oct. 14, 2022).

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **65** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

an image of a bluebird standing on a car's side mirror and looking at the viewer, with silhouetted

trees in the background—that 76 and its fossil fuels align with the values of environmentally

conscious consumers: "We're on the driver's side®. And the environment's."



**Figure 8:** ConocoPhillips 76 Fuels Website: Top Tier Gas

4.140.  Defendants' marketing is reminiscent of the tobacco industry's effort to promote

"low-tar" and "light" cigarettes as an alternative to quitting smoking after the public became

aware cigarettes caused cancer. Cigarette makers promoted "light" and "low tar" cigarettes as a

healthier choice, even though the health benefits from smoking a "light" cigarette compared to

a regular cigarette was negligible and any use of cigarettes was harmful. Defendants similarly

aim to reassure consumers that using simply choosing their gasoline and motor oils will reduce

their impact on climate change when in fact the benefits for the climate are negligible and

burning all gasolines will contribute to climate change.

4.141.  Cigarette makers also used scientific and engineering terms in their advertising

of "light" cigarettes to enhance their credibility. Exxon's advertising for Synergy™ and "green"

Mobil 1™ products similarly employs phrases like "meticulous[] engineer[ing]," "breakthrough

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **66** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

technology," "rigorously tested in the lab," "proprietary formulation," "test data," "engineers," "innovat[ion]," and "Scientists Deliver [] Unexpected Solution[s]."[125]

**J.      Defendants promote unrealistic or unproven technologies as clean energy solutions for people currently relying on Defendants' fossil fuels.**

4.142.  Defendants also promote unrealistic or unproven technologies as clean energy solutions for the average consumer who currently relies on Defendants' fossil fuels to power their cars or homes. These ads leave people with the deceptive impression that such technologies are currently viable, or soon to be viable, and will soon permit everyday consumers continued reliance on fossil fuels or related infrastructure, such as gas or coal-fired power plants or internal combustion engines for cars. Defendants omit material information and context for these claims, as described in the below illustrative examples:

4.143.  Exxon regularly advertises its efforts to capture and store carbon, leaving consumers with the impression that Exxon does this to benefit the climate. Exxon does not disclose that the massive energy required to capture that carbon is powered by fossil fuels emitting more greenhouse gasses into the air[126] Further, nearly all the carbon Exxon has captured was not simply stored, but used to drill for more oil.

---

[125] See, e.g., EnergyFactor by ExxonMobil, Green Motor Oil? ExxonMobil Scientists Deliver an Unexpected Solution (July 19, 2016); Exxon Mobil, Fuels, https://www.exxon.com/en/fuels (last visited Oct. 14, 2022).
[126] Kusnetz, Nicholas. Exxon's Long-Shot Embrace of Carbon Capture in the Houston Area Just Got Massive Support from Congress. (Sept. 25, 2022) https://insideclimatenews.org/news/25092022/exxon-houston-ship-channel-carbon-capture/

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 67 of 98



4.144. For almost a decade, Exxon also claimed it had a new climate solution: algae biofuels. As recently as 2018, Exxon claimed it would be producing 10,000 barrels of algae biofuel by 2025 and that this fuel could reduce "carbon emissions from transportation" by more than fifty percent.[127] In 2019, Exxon continued to advertise that "it is growing algae for biofuels that could one day power planes, propel ships, and fuel trucks, and cut their emissions in half."[128]

4.145. Exxon ultimately invested just $335 million of the $600 million it had promised to develop the technology before quietly pulling the plug on the project in December 2022.[129]

---

[127] The Future of Energy? It May Come From Where You Least Expect (ExxonMobil Paid Post), N.Y. Times, https://www.nytimes.com/paidpost/exxonmobil/the-future-of-energy-it-may-come-from-where-you-least-expect.html.
[128] Exxon Mobil TV Spot, 'Alge Potential'. (Oct. 19, 2019) https://www.ispot.tv/ad/ovGn/exxon-mobil-algae-potential.
[129] Big oil firms touted algae as climate solution. Now all have pulled funding. The Guardian. (March 17, 2023). https://www.theguardian.com/environment/2023/mar/17/big-oil-algae-biofuel-funding-cut-exxonmobil.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 68 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

77

4.146.  On information and belief, Exxon spent nearly half as much as its actual investment in developing algae biofuel on advertising its commitment to algae biofuels.[130]

4.147.  On information and belief, Exxon's $335 million investment in algae was far short of the several billion dollars that algae researchers believe is necessary to commercialize algae biofuels.[131]

4.148.  In addition to not disclosing the miniscule scale of these efforts, Exxon's ads do not acknowledge that Exxon's biodiesel fuel is generally a blend that uses only 5% to 20% biofuel, with the remainder composed of fossil fuel. Thus, Exxon's greenwashing ads misleadingly overstate both the "sustainable" or "environmentally friendly" nature of its biodiesel investment as well as its scale.

170.  In another advertisement published in the Washington Post, Shell touts hydrogen fuel cell technology, promoting hydrogen as "[o]ne of the cleaner sources" that power electric vehicles, stating that "[h]ydrogen fuel cell vehicles . . . emit nothing from their tailpipes but water vapor."[132]

4.149.  In an online video, Shell advertised hydrogen fuels for cars to potential consumers in lieu of electric vehicles. Shell claimed:

---

[130] Big oil firms touted algae as climate solution. Now all have pulled funding. The Guardian. (March 17, 2023). https://www.theguardian.com/environment/2023/mar/17/big-oil-algae-biofuel-funding-cut-exxonmobil. (In its 12 years in the space, Exxon invested $350m in algae biofuels, according to spokesperson Casey Norton. (Norton says that's more than double what the company spent on touting this research in ads.)")
[131] Big oil firms touted algae as climate solution. Now all have pulled funding. The Guardian. (March 17, 2023). https://www.theguardian.com/environment/2023/mar/17/big-oil-algae-biofuel-funding-cut-exxonmobil.
[132] The Mobility Quandary. (Shell Paid Post). The Washington Post. https://www.washingtonpost.com/brand-studio/shell/the-mobility-quandary/

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 69 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500







---

133 @Shell_USA. A car that only emits water and heat? Learn more about #hydrogen, a fuel for the future that can help clean up transport today. X (formerly Twitter). (Dec. 20, 2017). https://twitter.com/Shell_USA/status/943401985193242625?ref_src=twsrc%5Etfw%7Ctwcamp%5Eembeddedtimeline%7Ctwterm%5Escreen-name%3Ashell_usa%7Ctwcon%5Es1.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

4.150. Shell admitted elsewhere – but not in these advertisements – that "most of hydrogen today is produced from fossil fuels such as natural gas," including the hydrogen that Shell provided to consumers at their hydrogen fueling stations in California.[134] As of 2021, fossil fuels produced more than 99 percent of hydrogen on the market.[135]

4.151. As with most of Defendants' short-lived but highly publicized investments in "clean energy solutions," Shell subsequently closed the five stations aimed at hydrogen fueling for passenger cars and "confirm[ed] that Shell has discontinued its plan to build and operate additional light-duty vehicle fueling stations in California."[136]

**K.  Defendants misleadingly promote themselves as clean energy companies actively working to achieve net-zero emissions.**

4.152. Defendants' representations and omissions described above imply that Defendants are clean energy companies actively working to solve climate change, but Defendants do not stop there. Defendants actively promote their brand to consumers as a clean energy business, even claiming that they are working to achieve net zero emissions. Defendants' promotions are false, misleading, and unfairly compete with other businesses who are primarily engaged in supplying clean energy.

---

[134]  Carbon Neutral Hydrogen. Shell United States. https://www.shell.us/motorist/shell-hydrogen-california-retail-hrs-project.html.
[135]  Global Hydrogen Review 2022. International Energy Agency. (Sept. 2022) pg. 71. https://www.iea.org/reports/global-hydrogen-review-2022.
[136]  Carbon Neutral Hydrogen. Shell United States. https://www.shell.us/motorist/shell-hydrogen-california-retail-hrs-project.html.; Dokso, Anela. Shell Abandons California Hydrogen Stations. H2 Energy News. (Sept. 19, 2023). https://energynews.biz/shell-abandons-california-hydrogen-stations/#:~:text=In%20essence%2C%20Shell%20has%20shuttered,California%20due%20to%20operational%20issues.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 71 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

1

2       4.153. Recognizing the potential to capture market share of "green" consumers, BP was

3   an early adopter of these tactics. For over two decades, BP claimed to consumers that it was

4   moving "beyond petroleum," "advancing the energy transition,"[137] and "transforming itself"[138]

5   to become a net zero energy business.

6       4.154. Beginning in 2000, BP began a $200 million campaign claiming it was moving

7   "beyond petroleum" with advertisements portraying BP as predominantly invested in clean

8   energy sources. Messages from that campaign included some projects, plans, and an overall

9   theme that BP was going to materially reduce its emissions and transition away from petroleum:

10

11

12  # It's time to go on a
13  # low carbon diet.

14

15  Cleaner fuels, natural gas, hydrogen, solar, wind . . .
    some of the ways we're trying to reduce carbon emissions.



16

beyond petroleum

17

18

19

20

21

22

23

24  ―――――――――――――
    [137]   BP.   BP's   Shift   to   Gas.   Youtube.   (Dec.   6   2017)
    https://www.youtube.com/watch?v=lLwpc5MUmUM.
25  [138] Our Transformation. BP. (Sept. 4, 2023). https://www.bp.com/en/global/corporate/who-we-
    are/our-transformation.html.

26

COMPLAINT FOR DAMAGES AND                                      SHER EDLING LLC
INJUNCTIVE RELIEF                                        100 Montgomery St., Ste. 1410
                                                           San Francisco, CA 94104
                                                              (628) 231-2500
PAGE **72** of **98**

[139] BP Advert (Revised) Beyond Petroleum Ad. Youtube. (May 10, 2007). https://www.youtube.com/watch?v=irDhWudV-7w&list=PL4SVnWogxWYvFLayEJM3phaX8EbD9Pz0J&index=7

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **73** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

4.155. BP succeeded in persuading consumers that it was an eco-friendly company, capturing consumer demand for oil companies to respond to the threat of climate change.[140] From 2000 to 2007, according to BP, its brand awareness went from four percent to 67 percent.[141]

4.156. In reality, BP's investments in clean energy was only a small percentage of its total capital expenditure during this period. The vast majority of BP's investments during this period were to increase fossil fuel exploration, production, refining, and marketing.[142]

4.157. Though BP abandoned the "beyond petroleum" moniker in 2013, BP continues to portray itself to consumers as predominantly invested in clean energy.

4.158. In more recent years, BP has run advertisements intended to "advance and protect the role of gas – and BP – in the future of energy conversation."[143] These advertisements claim natural gas is a clean energy source, similar to renewables, and, through its production of natural gas, BP is "advancing the energy transition."[144]

4.159. In 2019, BP's CEO announced it was, once again, time to "let people know we are engaged in this big energy transition and have a big core business." BP launched the "Possibilities Everywhere" campaign. The advertising campaign once again exaggerated BP

---

[140] Cherry, Miriam A. et al. <u>Beyond Profit: Rethinking Corporate Social Responsibility and Greenwashing After the BP Oil Disaster.</u> Saint Louis University School of Law. (2011) pg. 1002-1008. (describing the "halo created by a decade of smart advertising" that positioned BP on the green side of energy development and how environmentalists had rated BP as the "eco-friendly gas station choice") https://scholarship.law.slu.edu/cgi/viewcontent.cgi?article=1375&context=faculty.

[141] Nastu, Jennifer. <u>'Beyond Petroleum' Pays Off for BP.</u> Environment and Energy Leader. (Jan. 15, 2008) https://www.environmentenergyleader.com/2008/01/beyond-petroleum-pays-off-for-bp/

[142] <u>Annual Report and Accounts 2008.</u> BP. https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-annual-report-accounts-2008.pdf.

[143] Brunswick Advocacy Campaign document at 2.

[144] BP. <u>BP's Shift to Gas.</u> Youtube. (Dec. 6 2017) https://www.youtube.com/watch?v=ILwpc5MUmUM

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 75 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

investments in clean energy and (alleged) support for a clean energy transition and misleadingly portrayed natural gas as a clean energy similar to wind and solar power.[145]

4.160. One Possibilities Everywhere advertisement from 2020, called "Advancing," BP shows imagery of drought and storms, alluding to climate change. BP then states the world needs energy "that is kinder to our planet." Such energy sources are "cleaner, greener, smarter energy." BP presents images of those energy sources: solar, hydro, and wind power alongside natural gas, implying that natural gas is also a clean, green energy:





---

[145] Farand, Chloe. <u>BP's First Global Advertising Campaign Since Deepwater Horizon Accused of Being 'Deceptive and Hypocritical'.</u> DeSmog. https://www.desmog.com/2019/01/29/bp-first-global-advertising-campaign-deepwater-horizon-accused-greenwashing-deceptive/.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **76** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

Finally, BP presents itself as leading that transition: "With our scale and know-how, our partnerships and new investments, we'll search for energy the world needs to progress, seeking new possibilities in everything, everywhere."[146]

4.161.  In another ad, called "Blade Runners," BP described itself as "one of the major wind energy businesses in the US."[147] Yet, at the time of this advertisement in 2019, BP owned approximately 1.7 gigawatts ("GW") of wind capacity, which is dwarfed by other companies including GE, Siemens, and Vestas (with about 39 GW, 26 GW, and 23 GW capacities, respectively).[148] And BP's total wind capacity was just roughly one percent of total installed wind power in the United States.[149]

4.162.  WPP, one of BP's public relations firms, describes BP's strategy at this time to portray BP as "advancing the energy transition"[150]:

---

[146]        BP        Keep        Advancing        Advertisement. https://www.dropbox.com/s/dgzea4w30tfbnc9/2020_B143196_BP_Advancing_video_edits__US-UK_MASTER_PR002.mp4?dl=0.
[147]        Blade        Runners.        BP.        (2019). https://web.archive.org/web/20191130192545/https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/wind-and-natural-gas.html.
[148] For BP's wind capacity, see: Press Release. BP Advances Offshore Wind Growth Strategy (Feb. 8, 2021), https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-advances-offshore-wind-growth-strategy.html  For wind capacity of GE, Siemens, and Vestas, see: McClain, Abby. The 15 Largest Wind Power Companies in the World (April 18, 2023), https://www.zippia.com/advice/largest-wind-power-companies/.
[149] Ingram, Elizabeth. U.S. wind capacity grew 8% in 2018, AWEA says. Renewable Energy World. (April 10, 2019). https://www.renewableenergyworld.com/wind-power/onshore/u-s-wind-capacity-grew-8-in-2018-awea-says/.
[150]  BP   Creative   Workshop   Briefing   Document.   WPP.   (Jan.   14,   2020) https://www.documentcloud.org/documents/20073850-bp-creative.

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500



4.163.    Acknowledging that "[s]ociety is increasingly recognizing that there is a climate emergency requiring a rapid energy transition," BP then adjusted their brand positioning to reinvent itself as "transforming . . . to help the world reach carbon neutrality and improve people's lives. We get it, and no company is more willing or able to make this happen."[151]

---

[151]  BP   Creative   Workshop   Briefing   Document.   WPP.   (Jan.   14,   2020) https://www.documentcloud.org/documents/20073850-bp-creative.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **78** of **98**

4.164. Other Defendants have followed suit, seeking to portray themselves as clean energy businesses leading the transition away from fossil fuels.

4.165. Shell launched the "Make the Future" campaign, which presents various *ideas* of how one could reduce emissions or develop clean energy as well as Shell's "target" to achieve net zero emissions.

4.166. For example, one of Shell's Make the Future advertisements included a video describing the company's "target" to achieve net zero emissions[152]:

---

[152] Sponsored Advertisement by Shell. <u>By working together, we can achieve a net-zero emissions world. Click to learn more. #MakeTheFuture.</u> Facebook. (May 10, 2021 to June 27, 2021). https://www.facebook.com/ads/library/?active_status=all&ad_type=political_and_issue_ads&country=US&id=487103519201014&view_all_page_id=200969413280005&search_type=page&media_type=all

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE 79 of 98









COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **80** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

89

4.167.  If a person clicks on the link to Shell's website, they will see images of wind turbines and solar panels as they scroll through pages of how Shell is "Tackling climate change," helping to achieve the goal "laid out in the Paris Agreement," and is "transforming our business" to meet their target of net zero emissions. They will read about how Shell provides renewable electricity and electric vehicle charging, is restoring habitats and clean water through reforestation efforts, and even has an "approach to a fair and just transition." All this gives an impression that Shell *is*, currently, transforming its business to reduce emissions. Yet, after scrolling through all this information, the reader may click on a "legal disclaimer." Buried in the middle of the disclaimer, Shell states: "Shell's operating plans, outlooks, budgets and pricing assumptions do not reflect our net-zero emissions target."[153]

4.168.  One of Shell's public relations firms aptly describes the intent of Shell's Make The Future campaign as follows:[154]

---

[153] Our Climate Target. Shell United States. https://www.shell.us/energy-and-innovation/our-climate-target.html?utm_source=facebook&utm_medium=social&utm_content=fv_4_0015&utm_campaign=nz_ld_us_apr-jun_2021&linkId=117937083#iframe=L3dlYmFwcHMvY2xpbWF0ZV9hbWJpdGlvbl9VU19OZXXRfemVyb1yb18yMDIyLw

[154] Shell South Pole Energy Challenge. Edelman via archive.today. (Acc. Jul 25, 2023). https://archive.ph/IZ8Qz

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **81** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

As part of their efforts to make consumers, particularly millennials, aware of their commitment to cleaner energy, Shell launched the #makethefuture campaign. The company tasked Edelman with the job of giving millennials a reason to connect emotionally with Shell's commitment to a sustainable future. We needed them to forget their prejudices about "big oil" and think differently about Shell.

4.169. Following an advertising campaign linking Shell to a polar expedition using renewable fuels, Edelman stated the "Business Outcome" of its campaign, which included:

- Audience members are 31% more likely to believe Shell is committed to cleaner fuels.
- Positive attitudes towards the brand increased by 12%

4.170. Mediacom, another public relations firm working on Shell's "Make the Future" campaign, candidly stated that "Shell's 'Make The Future' communications ultimately seek to change or enhance the perception of the brand among all potential customers and stakeholders."[155] The "target audience" for their project included an "'Energy Engaged Customer' (EEC) audience – 18-54 years old, curious, open-minded and outward-looking individuals who are also potential customers of Shell's products and services. Our mission was to recruit, engage and ultimately improve perception of the Shell brand." To deliver on the mission, the firm would create content showing *ideas* to decarbonize the home, reduce emissions of passenger cars, make deliveries more efficient, and plan an all-electric journey.

---

[155] Winner 2021, Corporate Influencer, Shell, Mediacom, Pitch the Future. World Media Group. (2021). https://world-media-group.com/case-study/pitch-the-future-case-study-2021/

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **82** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

4.171.  In other words, Shell's advertising campaign focuses on its net zero "target," as well as ideas or possibilities to decarbonize, leaving consumers with the impression that this is a primary focus of Shell's business.

4.172.  In reality, Shell planned to spend four times more money on oil and gas development than on renewable technology in 2022.[156] Independent analysis of Shell's spending plans shows that the company will be emitting _more_ greenhouse gas by 2030 than it currently emits.[157] On its current trajectory, Shell is projected to miss its emissions reduction targets for both 2030 and 2050.[158]

4.173.  In June 2023, the U.K.'s Advertising Standards Authority banned Shell's marketing campaign describing Shell as providing renewable energy, installing electric vehicle charging, and driving the energy transition. The Advertising Standards Authority found consumers were likely to interpret the marketing materials as making a "broader claim about Shell as a whole providing cleaner energy." Since the "vast majority" of its operations was not clean energy, the campaign was misleading.[159]

4.174.  ConocoPhillips claims its "actions for our oil and gas operations are aligned with the aims of the Paris Agreement" and touts its actions and achievements toward the net-zero energy transition. ConocoPhillips also touts its "Net-Zero Roadmap," which it describes as a "Paris-Aligned Climate Risk Strategy" and "a comprehensive framework with an ambition to

---

[156] Simon Jack, Oil Giant Shell Says It Needs Oil to Pay for Green Shift, BBC News (Nov. 3, 2021), https://www.bbc.com/news/business-59154930.
[157] Id.
[158] Id.
[159] Id.
[159] Id.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **83** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

become a net-zero company for operational emissions by 2050."[160] ConocoPhillips thus focuses on its "operational" emissions while ignoring that combustion of its product continues to emit large amounts of greenhouse gases.

4.175.   In June 2023, ConocoPhillips published a profile on its Methane Measurement Manager Milind Bhatte, who it claims is helping move the company to its "goal" of "net-zero."[161]

4.176.   Chevron and Exxon have engaged in similar efforts to portray themselves as predominantly invested in clean energy and leading the energy transition.

4.177.   Functionally, Defendants have cut fossil fuels from their branding efforts--but not their business operations.  According to one analysis, between 2010 and 2018, BP spent 2.3% of total capital spending on low-carbon energy sources, Shell spent 1.2%, Chevron and Exxon just 0.2% each, and ConocoPhillips 0.0%.[162]

4.178.   Rather than reducing emissions, Defendants are ramping up fossil fuel production like never before. Exxon is projected to increase oil production by more than 35% between 2018 and 2030—a sharper rise than over the previous 12 years.[163] Shell is forecast to increase output by 38% by 2030, by increasing its crude oil production by more than half and its gas production

---

[160]   https://www.conocophillips.com/; https://www.conocophillips.com/sustainability/low-carbon-technologies/operational-net-zero-roadmap/.

[161]   https://www.conocophillips.com/spiritnow/story/milind-bhatte-progressing-toward-net-zero/?utm_medium=osocial&utm_source=Twitter&utm_content=image&utm_term=post:1666 504399403316370&utm_campaign=campaign:1601648882546323569.

[162]   Anjli Raval & Leslie Hook, Oil and Gas Advertising Spree Signals Industry's Dilemma, Financial Times (Mar. 6, 2019), https://www.ft.com/content/5ab7edb2-3366-11e9-bd3a-8b2a211d90d5.

[163]   Jonathan Watts et al., Oil Firms to Pour Extra 7m Barrels Per Day Into Markets, Data Shows, The Guardian (Oct. 10, 2019), https://www.theguardian.com/environment/2019/oct/10/oil-firms-barrels-markets.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **84 of 98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

by over a quarter.[164] BP is projected to increase production of oil and gas by 20% by 2030.[165]

Chevron set an oil production record in 2018 of 2.93 million barrels per day.[166] A 2019 investor

report touted Chevron's "significant reserve additions in 2018" in the multiple regions in North

America and around the world, as well as significant capital projects involving construction of

refineries worldwide.[167] ConocoPhillips' new Willow Project in Alaska is expected to produce

approximately 576 million barrels of oil, with associated indirect GHG emissions equivalent to

*239 million tons of CO2.*

**L.  Alternative energy technologies, including some developed by Defendants, could have replaced or significantly reduced fossil fuel dependence.**

4.179. Opportunities to reduce the use of fossil fuels and associated greenhouse

emissions, mitigate the harms associated with the use and consumption of fossil fuels, and

promote development of alternative, clean energy sources have been available for decades.

Indeed, Defendants themselves developed some of these technologies, though they did not

promote them. Examples include, but are not limited to:

a.  In 1963, Esso (Exxon Mobil) obtained multiple patents on technologies

for fuel cells,[168] including on the design of a fuel cell and necessary electrodes,[169] and on a

---

[164] Id.
[165] Id.
[166] Kevin Crowley & Eric Roston, Chevron Aligns Strategy with Paris Deal But Won't Cap Output, Bloomberg (Feb. 7, 2019), https://www.bloomberg.com/news/articles/2019-02-07/chevron-pledges-alignment-with-paris-accord-but-won-t-cap-output.
[167] Chevron, Chevron 2019 Investor Presentation (Feb. 2019), https://chevroncorp.gcs-web.com/static-files/c3815b42-4deb-4604-8c51-bde9026f6e45.
[168] Fuel Cells, Hydrogen and Fuel Cell Technologies Office. Department of Energy: Office of Energy Efficiency and Renewable Energy. https://www.energy.gov/eere/fuelcells/fuel-cells.
[169] ExxonMobil Research Engineering Co., Patent US3116169A: Fuel cell and fuel cell electrodes (granted Dec. 31, 1963), https://www.google.com/patents/US3116169.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE 85 of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

process for increasing the oxidation of a fuel, specifically methanol, to produce electricity in a fuel cell.[170]

b.    In 1970, Esso (Exxon Mobil) obtained a patent for a "low-polluting engine and drive system" that used an interburner and air compressor to reduce pollutant emissions, including $CO_2$ emissions, from gasoline combustion engines (the system also increased the efficiency of fossil fuels used in such engines, thereby lowering the amount of fossil fuel product necessary to operate engines equipped with this technology).[171]

c.    A 1989 article in a publication from Exxon Corporate Research for company use only stated: "Since energy generation from fossil fuels dominates modern CO2 emissions, strategies to limit CO2 growth focus near term on energy efficiency and long term on developing alternative energy sources. Practiced at a level to significantly reduce the growth of greenhouse gases, these actions would have substantial impact on society and our industry—near-term from reduced demand for current products, long term from transition to entirely new energy systems."[172]

d.    In 1973, Shell obtained a patent for a process to remove acidic gases, including $CO_2$, from gaseous mixtures.[173]

---

[170] ExxonMobil Research Engineering Co., <u>Patent US3113049A: Direct production of electrical energy from liquid fuels</u> (granted Dec. 3, 1963), https://www.google.com/patents/US3113049.

[171] ExxonMobil Research Engineering Co., <u>Patent US3513929A: Low-polluting engine and drive system</u> (granted May 26, 1970), https://www.google.com/patents/US3513929.

[172] Flannery, Brian. <u>Greenhouse Science, Connections: Corporate Research, Exxon Research and Engineering Company</u> (Fall 1989), http://www.climatefiles.com/exxonmobil/1989-exxon-mobil-article-technologys-place-marketing-mix.

[173] Shell Oil Co., <u>Patent US3760564A: Process for the removal of acidic gases from a gas mixture,</u> (granted Sept. 25, 1973), https://www.google.com/patents/US3760564A.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **86 of 98**

e.     Phillips Petroleum Company (ConocoPhillips) obtained a patent in 1966 for a "Method for recovering a purified component from a gas" outlining a process to remove carbon from natural gas and gasoline streams.[174]

4.180.   Defendants have been aware for decades that clean energy presents a feasible alternative to fossil fuels. In 1980, Exxon forecasted that non-fossil fuel energy sources, if pursued, could penetrate half of a competitive energy market in approximately 50 years.[175] This internal estimate was based on extensive modeling within the academic community, including research from David Rose at the Massachusetts Institute of Technology which concluded that a transition to non-fossil energy could be achieved in around 50 years. Exxon circulated an internal memo approving of Rose's conclusions, stating they were "based on reasonable assumptions."[176]

4.181.   Likewise, a 1987 Shell briefing on "Synthetic Fuels and Renewable Energy" noted that while "immediate prospects" were "limited," "nevertheless it is by pursuing commercial opportunities now and in the near future that the valuable experience needed for further development will be gained." The brief also noted that "the task of replacing oil resources is likely to become increasingly difficult and expensive and there will be a growing need to develop lean, convenient alternatives. Initially these will supplement and eventually replace valuable oil products. Many potential energy options are as yet unknown or at very early stages of research and development.   New energy sources take decades to make a major global

---

[174] Phillips Petroleum Co., Patent US3228874A: Method for recovering a purified component from a gas (granted Jan. 11, 1966), https://patents.google.com/patent/US3228874.

[175] H. Shaw and P. P. McCall, Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect 5 (Dec. 18, 1980). https://insideclimatenews.org/wp-content/uploads/2015/09/Technological-Forecast-on-CO2-Greenhouse-Effect-1980.pdf.

[176] CO2 Greenhouse Effect: A Technical Review, Coordination and Planning Division, Exxon Research and Engineering Company 18 (Apr. 1, 1982).

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **87** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

contribution. Sustained commitment is therefore needed during the remainder of this century to ensure that new technologies and those currently at a relatively early stage of development are available to meet energy needs in the next century."[177]

4.182.    Despite the knowledge that alternative energies presented a viable alternative and that it was important to begin the transition as soon as possible, Defendants chose to delay this transition by deceiving consumers and the public.

**M.    Defendants' wrongful conduct is a proximate cause of the Tribe's harms.**

4.183.    Defendants' actions in concealing the dangers of, promoting false and misleading information about, and engaging in massive campaigns to promote increasing use of fossil fuels have succeeded in misleading consumers and the public in Washington, including on the Makah Reservation, and elsewhere about the climate impacts of using fossil fuels, depriving people of the truth about the consequences of their decisions to buy and use fossil fuels and technologies dependent on fossil fuels.    Further, Defendants' conduct has obstructed and delayed the introduction and adoption of alternative, low-carbon technologies.    Defendants have succeeded in delaying the transition to alternative, low-carbon technologies, deepened consumers' dependence on fossil fuels, driven increased use of oil and gas, and contributed substantially to the buildup of carbon dioxide in the atmosphere that causes global warming and its physical, environmental, and socioeconomic consequences, including those affecting and harming the Makah Tribe.

---

[177] Synthetic Fuels and Renewable Energy, Shell Service Briefing, no. 2, 1987, https://assets.documentcloud.org/documents/4411089/Document2.pdf.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **88** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

4.184. Defendants' deceptive and tortious conduct as described in this Complaint is a proximate cause of devastating climate change impacts to the Makah Tribe, including: sea-level rise, more frequent and intense rainfall, and flooding, more frequent and intense heat waves, more frequent and intense droughts, more frequent, hotter, and more devastating wildfires, ocean acidification, degradation of air and water quality, harms to human health, and loss of habitat and species.

4.185. The increased consumption of fossil fuels induced by the Defendants' tortious and deceptive conduct caused, and will continue to cause, the release of huge amounts of otherwise avoidable greenhouse gases, thereby ensuring that the damage to the Makah Tribe resulting from climate change will be severe and ongoing for decades to come.

**N.     The Tribe has sustained, and will sustain, substantial harms and losses.**

4.186. The Tribe has incurred, and will foreseeably continue to incur, injuries and damages of increasing severity due to the climate crisis proximately caused by Defendants' tortious and deceptive conduct as described in this Complaint. These injuries and damages include but are not limited to:  injury or destruction of Tribal-owned or -operated facilities and property deemed critical for operations, utility services, and risk management, destruction of Tribal natural resources, including forest lands and coastal resources, as well as other assets essential to community health, safety, and well-being; increased planning and preparation costs for community adaptation and resilience to climate change's effects; and increased costs associated with public health impacts, environmental impacts, and economic impacts.

4.187. Specifically:

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **89 of 98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

a.      With its reservation surrounded by ocean waters, the Makah Tribe is particularly vulnerable to severe harms and damages from sea-level rise. The Tribe has experienced and will continue to experience significant and accelerating sea-level rise over the coming decades.[178]   The Tribe's residents and its essential governmental infrastructure at Neah Bay are at high risk of coastal flooding now and in the coming decades.

b.      The destructive force and flooding potential from storm surges during coastal storms and other weather events have increased as the mean sea level of the Makah Reservation has increased, and the combined effects of storm surge and sea-level rise will continue to exacerbate flooding impacts upon the Tribe and its Reservation. Even if all carbon emissions were to cease immediately, the Tribe would continue to experience sea-level rise due to the greenhouse gases already released from burning fossil fuels, and the lag time between emissions and sea-level rise.

c.      Climate change is expected to significantly alter the frequency and intensity of precipitation events on and affecting the Makah Reservation. By 2100, annual precipitation levels on the Makah Reservation, are projected to rise by up to 8.5 inches.[179]

d.      The Tribe has already incurred significant costs on projects to address sea-level rise, including but not limited to: planning for and moving governmental infrastructures, service facilities, and housing for the Tribe's citizens to higher ground and planning for adaptation and/or rerouting reservation roads that are being destroyed by sea-level rise, attending storm surges, and flooding.

---

[178] https://climate.northwestknowledge.net/NWTOOLBOX/tribalProjections.php.
[179] https://climate.northwestknowledge.net/NWTOOLBOX/tribalProjections.php.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **90 of 98**

e.      Climate change is causing more extreme weather events in and on the Makah Reservation, with attendant physical and environmental consequences, including coastal flooding, coastal erosion, inland flooding, extreme heat events, and drought.

f.      Climate change is reducing winter snow pack, increasing surface water temperatures, reducing low flows while increasing peak flows during extreme precipitation events, threatening aquatic life as well as the Tribe's water supplies.

g.      Oceans are acidifying at an alarming rate because of fossil-fuel burning, endangering the Tribe's coastal ecosystems and economy.

h.      The average air temperature has increased and will continue to increase in and on the Makah Reservation due to climate change. Annual average daily temperatures on the Reservation have already increased over 2° compared to historic levels, and are projected to increase as much as 8°F over historic levels by the end of the century.  Similarly, the number of very warm days (maximum temperature above 86°F) is projected to increase from 1 per year to as many as 15 per year by the end of the century.[180]  Warming air temperatures lead to poorer air quality, more heat waves, expanded pathogen and pest ranges, bigger, more intense, and more destructive wildfires, thermal stress for native flora and fauna, and threats to human health—such as from heat stroke and dehydration, due to increased evaporation and demand, and increased allergen exposure. Rising air temperatures will increase ground-level concentrations of ozone and particulate matter, raising the incidence of serious health risks like respiratory distress, cancer, chronic obstructive pulmonary disease ("COPD"), and cardiovascular disease

---

[180] https://climate.northwestknowledge.net/NWTOOLBOX/tribalProjections.php.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **91 of 98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

among Makah citizens, particularly among children, the elderly, and other vulnerable Makah citizens.

i.     The Tribe's expansive forests, an important economic resource for the Tribe, are vulnerable to the consequences of a warming climate.   Pests and invasive species are also expected to take advantage of warmer temperatures, declines in soil moisture, and hydrologic cycle disruption to spread into new areas. In addition, rising temperatures and more frequent droughts lead to a longer and more intense wildfire season.

4.188.  The Tribe has already invested heavily in and is planning, at significant expense, adaptation and mitigation strategies to address climate change-related impacts to mitigate and/or prevent injuries to itself and its citizens. These efforts include, but are not limited to, planning for and relocating housing for Makah citizens to higher ground, planning for and moving governmental infrastructure and services to higher ground, and planning for the redesign and/or relocation of reservation roads.

## V.     LEGAL CLAIMS

### COUNT ONE
### PUBLIC NUISANCE – CH. RCW 7.48

5.1.     The Tribe incorporates all the above paragraphs here.

5.2.     Under RCW 7.48.120, "[n]uisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river,  bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property." An actionable nuisance subject to damages and other relief includes

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **92** of **98**

"whatever is injurious to health or indecent or offensive to the senses . . . so as to essentially interfere with the comfortable enjoyment of the life and property." *Id.* 7.48.010. "A public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." *Id.* 7.48.130.

5.3.    Defendants, individually and in concert with each other, have engaged, and continue to engage in, unlawful, negligent, reckless, knowing, and/or intentional tortious conduct. Such conduct includes:

a.    promoting doubt in the public's mind about the existence, causes, and effects of climate change;

b.    promoting the sale and use of fossil fuels without warning consumers that using fossil fuels would cause dangerous climate change;

c.    promoting the sale and use of fossil fuels that Defendants knew to be hazardous and knew would cause or exacerbate climate change and related consequences, including, but not limited to, sea-level rise, drought, extreme precipitation, and extreme heat;

d.    promoting the sale and use of fossil fuels that Defendants knew to be hazardous and knew would cause or exacerbate climate change and related consequences, including, but not limited to, sea-level rise, drought, extreme precipitation events, and extreme heat events;

e.    concealing the hazards that Defendants knew would result from the normal use of their fossil fuels by misrepresenting, and casting doubt on, the integrity of scientific information related to climate change;

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **93** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

f.      promoting fossil fuels for uses that Defendants knew would be hazardous to consumers, the public, and the Tribe;

g.      disseminating and funding the dissemination of information that misleads consumers and the public regarding the known and foreseeable risk of climate change and its consequences, which follow from the normal, intended use of fossil fuels;

h.      misleadingly promoting fossil fuel products as sustainable, clean energy products;

i.      misleadingly presenting themselves as clean energy companies who are committed to reducing emissions; and

j.      misleadingly promoting their investments in alternative technologies as capable of reducing emissions on a large-scale in the near-term.

5.4.    Defendants' tortious conduct has caused harms to public health and property, as well as the ability of the Makah Tribe and its citizens to comfortably enjoy life and property. Defendants' campaign of deception has been pervasive and long-lasting. Their willful campaign has influenced the public's purchasing and investment decisions for decades, driving increased demand for fossil fuels. It has also reduced demand for, and investment in, clean energy, thereby delaying the clean energy transition. This increased demand directly led to increased greenhouse gas emissions and is a substantial factor causing the Tribe's injuries.

5.5.    Defendants' conduct is the proximate cause of the Tribe's injuries. Defendants knew that continued fossil fuel consumption would lead to a climate crisis. They nonetheless chose to engage in a sophisticated deception campaign that had the purpose and effect of

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **94 of 98**

sustaining, and inflating, fossil fuel consumption. The Tribe's climate injuries are the direct and foreseeable result of Defendants' tortious conduct.

5.6.    The Tribe has already suffered substantial injuries, such as damages to infrastructure, governmental services facilities, Tribal residences, and reservation roads due to sea-level rise with attending storm surges and flooding and changes in rainfall patterns resulting in flooding.

5.7.    Defendants' tortious conduct has specially harmed the Tribe, and will continue to do so. The Tribe has had to spend millions of dollars to protect its infrastructure, governmental services facilities, Tribal residences, and reservation roads from sea-level rise, with attending storm surges and flooding, and from changes in rainfall patterns resulting in flooding.  Such expenditures will increase in the coming years.

5.8.    Defendants' ongoing interference with public rights is substantial and unreasonable. The harm to the Tribe is severe and more than the Tribe should be required to bear without compensation. Defendants' deceptive acts and omissions also lack any social utility because there is no utility in deceiving and misleading the public.

5.9.    Defendants' tortious and deceptive conduct described in this Complaint is therefore a proximate cause of an unreasonable and substantial interference with common rights held by the residents of the Makah Reservation, as well as all harms flowing from that public nuisance.

## COUNT TWO
## WASHINGTON PRODUCT LIABILITY ACT, FAILURE TO WARN – RCW 7.72

5.10.    The Tribe incorporates all above paragraphs by reference here.

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

PAGE **95** of **98**

5.11.   Under the Washington Product Liability Act, a defendant manufacturer is liable for failure to warn at the time of manufacture if: (1) defendants' products were not reasonably safe at the time of manufacture because defendants failed to adequately warn of those products' risks; and (2) the failure to  adequately warn caused harm. *See* RCW 7.72.030(1)(b). A manufacturer is liable for failing to warn after manufacture when it learns of or should have learned of a danger connected with its product after it was manufactured. In that instance, the manufacturer must provide warnings as a reasonably prudent manufacturer would do under the circumstances and is liable for any damages that its failure to warn caused. *See* RCW 7.72.030(1)(c).  A product seller other than a manufacturer (including wholesalers, distributors, and retailers) is liable for negligence, including for negligently failing to warn, and for misrepresentions and intentional concealment of information about the product.  *See* RCW 7.72.040(1)(a) and (c).

5.12.   Defendants' fossil-fuel products were, and are, not reasonably safe because Defendants have failed to  warn of the catastrophic risks to the climate from fossil fuel combustion. At the time of manufacture, the likelihood that Defendants' fossil-fuel products would cause catastrophic harm—including sea level rise and more frequent and intense flooding, drought, heat waves, and wildfires—rendered Defendants' failures to warn inadequate. Defendants' concomitant campaign to deceive the public about climate change and the role of fossil fuels in causing it further made warnings necessary.

5.13.   Post-manufacture, Defendants acquired increasingly detailed and sophisticated knowledge of the catastrophic effects of unabated fossil fuel use.  As a result, these Defendants had a duty to inform and warn users of the risks to the climate of which they had knowledge.  Defendants breached this duty by not only failing to warn or inform users of the climate-disruptive effects of

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **96** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

continued use of fossil fuels, but also by continuing to deceptively attack climate science and to promote themselves and fossil fuels as environmentally-friendly and sustainable.

5.14.   Further, those Defendants acting primarily as wholesalers, distributors and/or retailers of fossil fuel products at all relevant times knew those products would cause catastrophic harm, yet negligently failed to warn of those harms, and misrepresented and/or intentionally concealed the facts about unabated use of those products.

5.15.   Defendants' failures to warn, misrepresentations, and intentional concealments are a proximate cause of heightened fossil fuel consumption, which has directly led to elevated greenhouse gas emissions and, in turn, substantially worsened climate-change effects to the harm and detriment of the Makah Tribe. As a proximate result of Defendants' acts and omissions, the Tribe has incurred, is incurring, and will continue to incur damages to property, public health, and natural resources.

## VI.   PRAYER FOR RELIEF

**Wherefore, the Makah Tribe prays that the Court:**

6.1.   Adjudge and decree that Defendants have engaged in the conduct complained of herein.

6.2.   Order Defendants to abate the nuisance they created, including but not limited to funding an abatement fund to be managed by the Tribe to remediate and adapt its Reservation lands, natural resources, and infrastructure;

6.3.   Award joint and several compensatory damages, in an amount determined at trial for injury sustained by the Tribe as a result of Defendants' tortious conduct;

6.4.   Award pre-judgment and post-judgment interest, as provided by law;

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **97** of **98**

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

6.5.   Award the Tribe its reasonable costs and attorneys' fees as provided by law; and

6.6.   Award any other and further relief the Court deems just and equitable.

## VII.   REQUEST FOR JURY TRIAL

7.1.   The Tribe respectfully requests that all issues presented by the above Complaint be tried by a jury, with the exception of any issues that, by law, must be tried before the Court.

Dated this 20th day of December, 2023.

Respectfully submitted,

**SHER EDLING LLP**

*/s/ Corrie J. Yackulic*
CORRIE J. YACKULIC, WSBA No. 16063
VICTOR M. SHER (*pro hac vice forthcoming*)
MATTHEW K. EDLING (*pro hac vice forthcoming*)
Sher Edling LLP
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Tel:   (628) 231-2500
Fax:   (628) 231-2929
Email: corrie@cjylaw.com
       vic@sheredling.com
       matt@sheredling.com

*Attorneys for Plaintiff, MAKAH INDIAN TRIBE*

**DRUMMOND WOODSUM & MACMAHON**

KAIGHN SMITH JR. (*pro hac vice forthcoming*)
84 Marginal Way, Suite 600
Portland, ME. 04101
Tel:   (207) 253-0559
Email: ksmith@dwmlaw.com

*Attorneys for Plaintiff, MAKAH INDIAN TRIBE*

COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF

PAGE **98** of 98

SHER EDLING LLC
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
(628) 231-2500

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING**

| | |
|---|---|
| MAKAH INDIAN TRIBE | No. 23-2-25216-1  SEA |
| VS | **CASE INFORMATION COVER SHEET AND AREA DESIGNATION** |
| EXXON MOBIL CORPORATION | |
| | (CICS) |

**CAUSE OF ACTION**

TTO - Tort /Other

**AREA OF DESIGNATION**

SEA          Defined as all King County north of Interstate 90 and including all of Interstate 90 right of way, all of the cities of Seattle, Mercer Island, Issaquah, and North Bend, and all of Vashon and Maury Islands.

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING**

| | |
|---|---|
| MAKAH INDIAN TRIBE | No. 23-2-25216-1  SEA |
| VS | **ORDER SETTING CIVIL CASE SCHEDULE** |
| EXXON MOBIL CORPORATION | **ASSIGNED JUDGE: Josephine Wiggs, Dept. 17**<br>FILED DATE: 12/20/2023<br>TRIAL DATE:12/23/2024 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

## I. NOTICES

**NOTICE TO PLAINTIFF:**
The Plaintiff may serve a copy of this **Order Setting Case Schedule (*Schedule*)** on the Defendant(s) along with the *Summons and Complaint/Petition.* Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the *Summons and Complaint/Petition* or (2) service of the Defendant's first response to the *Complaint/Petition*, whether that response is a *Notice of Appearance*, a response, or a Civil Rule 12 (CR 12) motion.  The *Schedule* may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLCR*] -- especially those referred to in this *Schedule*. In order to comply with the *Schedule*, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].

**You are required to give a copy of these documents to all parties in this case.**

## I. NOTICES (continued)

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS:**
A filing fee of **$240** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule. The court will review the confirmation of joinder document to determine if a hearing is required. If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of all parties and claims is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of all parties and claims is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING AND TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and crossclaims have been filed. If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $250 arbitration fee.** If a party seeks a trial de novo when an arbitration award is appealed, a fee of $400 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4A.630.020 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements and/or Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| * | CASE EVENT | EVENT DATE |
|---|---|---|
| | Case Filed and Schedule Issued. | 12/20/2023 |
| * | Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [See KCLMAR 2.1(a) and Notices on Page 2]. **$250 arbitration fee must be paid** | 05/29/2024 |
| * | **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration [See KCLCR 4.2(a) and Notices on Page 2]. | 05/29/2024 |
| | **DEADLINE** for Hearing Motions to Change Case Assignment Area [KCLCR 82(e)]. | 06/12/2024 |
| | **DEADLINE** for Disclosure of Possible Primary Witnesses [See KCLCR 26(k)]. | 07/22/2024 |
| | **DEADLINE** for Disclosure of Possible Additional Witnesses [See KCLCR 26(k)]. | 09/03/2024 |
| | **DEADLINE** for Jury Demand [See KCLCR 38(b)(2)]. | 09/16/2024 |
| | **DEADLINE** for a Change in Trial Date [See KCLCR 40(e)(2)]. | 09/16/2024 |
| | **DEADLINE** for Discovery Cutoff [See KCLCR 37(g)]. | 11/04/2024 |
| | **DEADLINE** for Engaging in Alternative Dispute Resolution [See KCLCR 16(b)]. | 11/25/2024 |
| | **DEADLINE**: Exchange Witness & Exhibit Lists & Documentary Exhibits [KCLCR 4(j)]. | 12/02/2024 |
| * | **DEADLINE** to file Joint Confirmation of Trial Readiness [See KCLCR 16(a)(1)] | 12/02/2024 |
| | **DEADLINE** for Hearing Dispositive Pretrial Motions [See KCLCR 56; CR 56]. | 12/09/2024 |
| * | Joint Statement of Evidence [See KCLCR 4 (k)] | 12/16/2024 |
| | **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file proposed Findings of Fact and Conclusions of Law with the Clerk) | 12/16/2024 |
| | Trial Date [See KCLCR 40]. | 12/23/2024 |

*The * indicates a document that must be filed with the Superior Court Clerk's Office by the date shown.*

## III. ORDER

Pursuant to King County Local Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above.  Penalties, including but not limited to sanctions set forth in Local Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance.  It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.


DATED:     12/20/2023

_____

PRESIDING JUDGE

## IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE.**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule. The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:** If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:** Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**CASE SCHEDULE AND REQUIREMENTS:** Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

### A. Joint Confirmation regarding Trial Readiness Report
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g., interpreters, equipment).

The Joint Confirmation Regarding Trial Readiness form is available at www.kingcounty.gov/courts/scforms. If parties wish to request a CR 16 conference, they must contact the assigned court. Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding the report.

### B. Settlement/Mediation/ADR
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand. Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held. FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

### C. Trial
Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court. The Friday before trial, the parties should access the court's civil standby calendar on the King County Superior Court website www.kingcounty.gov/courts/superiorcourt to confirm the trial judge assignment.

## MOTIONS PROCEDURES

### A. Noting of Motions

**Dispositive Motions:** All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge. The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules. Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Non-dispositive Motions:** These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered. All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements.

Rather than noting a time of day, the Note for Motion should state "Without Oral Argument." Local Civil Rule 7 governs these motions, which include discovery motions. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge. All other motions should be noted and heard on the Family Law Motions calendar. Local Civil Rule 7 and King County Family Law Local Rules govern these procedures. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

**Emergency Motions:** Under the court's local civil rules, emergency motions will usually be allowed only upon entry of an Order Shortening Time. However, some emergency motions may be brought in the Ex Parte and Probate Department as expressly authorized by local rule. In addition, discovery disputes may be addressed by telephone call and without written motion, if the judge approves in advance.

**B. Original Documents/Working Copies/ Filing of Documents: All original documents must be filed with the Clerk's Office.** Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court. The exceptions to the e-filing requirement are also available on the Clerk's Office website. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge. The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom. Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator. Working copies can be submitted through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk/documents/eWC.

**Service of documents:** Pursuant to Local General Rule 30(b)(4)(B), e-filed documents shall be electronically served through the e-Service feature within the Clerk's eFiling application. Pre-registration to accept e-service is required. E-Service generates a record of service document that can be e-filed. Please see the Clerk's office website at www.kingcounty.gov/courts/clerk/documents/efiling regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion. **Do not file the original of the proposed order with the Clerk of the Court.** Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order. The court may distribute orders electronically. Review the judge's website for information: www.kingcounty.gov/courts/SuperiorCourt/judges.

**Presentation of Orders for Signature:** All orders must be presented to the assigned judge or to the Ex Parte and Probate Department, in accordance with Local Civil Rules 40 and 40.1. Such orders, if presented to the Ex Parte and Probate Department, shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). If the assigned judge is absent, contact the assigned court for further instructions. If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the Ex Parte and Probate Department.** Such orders shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department. **If final order and/or formal proof are entered in the Ex Parte and Probate Department, counsel is responsible for providing the assigned judge with a copy.**

**C. Form**

Pursuant to Local Civil Rule 7(b)(5)(B), the initial motion and opposing memorandum shall not exceed 4,200 words and reply memoranda shall not exceed 1,750 words without authorization of the court. The word count includes all portions of the document, including headings and footnotes, except 1) the caption; 2) table of contents and/or authorities, if any; and 3): the signature block. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

***IT IS SO ORDERED. FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS. PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.***

_____
PRESIDING JUDGE

# EXHIBIT 2

Case 2:24-cv-00157 Document 2 Filed 02/06/24 Page 117 of 125

Skip to content

## Environment

### The Seattle Times

# Two PNW tribal nations sue oil companies over costs of climate change

Dec. 21, 2023 at 11:29 am



Cranes load coke for further refining Oct. 19 at Cherry Point Refinery in Blaine. (Kevin Clark / The Seattle Times)

116

Case 2:24-cv-00157 Document 1-2 Filed 02/06/24 Page 118 of 125

By Isabella Breda

*Seattle Times staff reporter*

Major oil companies for decades deliberately
sought to downplay and discredit scientific
warnings about the central role of fossil fuels in
causing climate change, alleges two lawsuits
filed this week by the Makah and Shoalwater Bay
tribes.

The lawsuits filed in King County Superior Court
name ExxonMobil, BP, Shell, Chevron,
ConocoPhillips and Phillips 66 as defendants,
and seek compensation for the millions of dollars
already spent, and likely to be spent in the
future, for the tribes to respond to climate-
induced disasters such as extreme heat, drought,
wildfire, shoreline erosion, sea level rise and
flooding.

The lawsuits allege the companies have known
fossil fuels would cause catastrophic climate
change since at least 1959, but continued
marketing massive quantities of oil and gas. They
allege the oil companies tried to mislead the public by funding op-eds and
advertisements in Seattle and national newspapers that claimed the science of climate
change was uncertain or lacking evidence.

The Seattle Times reached out to the six companies listed as defendants for comment
Thursday morning, but as of late afternoon, only Phillips 66 had responded. A
spokesperson declined to comment.

The complaints outline the companies' research and misleading marketing around their
products' role in causing climate change and the sea level rise, extreme weather, public
health harms and other climate effects on the tribes and their lands.

With both the Makah and Shoalwater Bay reservations on the Pacific Ocean, they are
particularly vulnerable to sea level rise, the lawsuits state. Both tribes have already

117

incurred the costs of moving their citizens to higher ground, and ocean acidification "at an alarming rate" from burning fossil fuels has endangered the tribes' coastal ecosystems and economy, according to the lawsuits.

"We are seeing the effects of the climate crisis on our people, our land, and our resources. The costs and consequences to us are overwhelming," said Makah Tribal Council Chair Timothy J. Greene, Sr. in a statement. "We intend to hold these companies accountable for hiding the truth about climate change and the effects of burning fossil fuels. And we aim to force them to help pay for the high costs of surviving the catastrophe caused by the climate crisis."

The lawsuits also cite a report by the Climate Impacts Group at the University of Washington that suggests with global warming of at least 1.5 degrees Celsius by 2050, Washington is projected to experience a 67% increase in the number of days per year above 90 degrees, relative to 1976-2005, leading to an increased risk of heat-related illness and death, warmer streams and more frequent algal blooms.

The report also found warming would fuel a decrease of 38% in snowpack, relative to 1970-99, leading to reduced water storage, irrigation shortages, and winter and summer recreation losses, as well as increases in winter streamflow, decreases in summer streamflow, leading to reduced summer hydropower, conflicts over water resources and negative effects on salmon.

"These oil companies knew their products were dangerous, yet they did nothing to mitigate those dangers or warn any of us about them, for decades," said Shoalwater Bay Chair Charlene Nelson in a written statement. "Now we are facing hundreds of millions of dollars in costs to relocate our community to higher ground and protect our people, our property, and our heritage. These companies need to be held accountable for that."

The tribes bring their claims under Washington's Products Liability Act for failure to warn, misrepresentation and intentional concealment. The complaints request jury trials, and ask the court to order the companies to create a fund to be managed by the tribes to remediate and adapt reservation lands, natural resources and infrastructure to climate change.

The lawsuits follow the path of more than 20 local and state governments that have sued fossil fuel companies over their role in climate change since 2017, according to E&E News.

*Isabella Breda:* 206-652-6536 or [ibreda@seattletimes.com](mailto:ibreda@seattletimes.com); *Seattle Times staff reporter Isabella Breda covers the environment.*

💬 View 128 Comments / 128 New

# EXHIBIT 3

## TREATY WITH THE MAKAH, 1855.

Jan. 31, 1855.

12 Stat., 939.
Ratified Mar. 8, 1859.
Proclaimed Apr. 18,
1859.

*Articles of agreement and convention, made and concluded at Neah Bay, in the Territory of Washington, this thirty-first day of January, in the year eighteen hundred and fifty-five, by Isaac I. Stevens, governor and superintendent of Indian affairs for the said Territory, on the part of the United States, and the undersigned chiefs, head-men, and delegates of the several villages of the Makah tribe of Indians, viz: Neah Waatch, Tsoo-Yess, and Osett, occupying the country around Cape Classett or Flattery, on behalf of the said tribe and duly authorized by the same.*

**Surrender of lands to the United States.**

ARTICLE 1. The said tribe hereby cedes, relinquishes, and conveys to the United States all their right, title, and interest in and to the lands and country occupied by it, bounded and described as follows, viz: Commencing at the mouth of the Oke-ho River, on the Straits of Fuca; thence running westwardly with said straits to Cape Classett or Flattery; thence southwardly along the coast to Osett, or the Lower Cape Flattery; thence eastwardly along the line of lands occupied by the Kwe-déh-tut or Kwill-eh-yute tribe of Indians, to the summit of the coast-range of mountains, and thence northwardly along the line of lands lately ceded to the United States by the S'Klallam tribe to the place of beginning, including all the islands lying off the same on the straits and coast.

**Boundaries.**

**Reservation.
Boundaries.**

ARTICLE 2. There is, however, reserved for the present use and occupation of the said tribe the following tract of land, viz: Commencing on the beach at the mouth of a small brook running into Neah Bay next to the site of the old Spanish fort; thence along the shore round Cape Classett or Flattery, to the mouth of another small stream running into the bay on the south side of said cape, a little above the Waatch village; thence following said brook to its source; thence in a straight line to the source of the first-mentioned brook, and thence following the same down to the place of beginning; which said tract shall be set apart, and so far as necessary surveyed and marked out for their exclusive use; nor shall any white man be permitted to reside upon the same without permission of the said tribe and of the superintendent or agent; but if necessary for the public convenience, roads may be run through the said reservation, the Indians being compensated for any damage thereby done them. It is, however, understood that should the President of the United States hereafter see fit to place upon the said reservation any other friendly tribe or band to occupy the same in common with those above mentioned, he shall be at liberty to do so.

**Whites not to reside thereon unless, etc.**

**Roads may be made.**

**Other friendly bands may be placed thereon.**

**Indians to settle on reservation within a year.**

ARTICLE 3. The said tribe agrees to remove to and settle upon the said reservation, if required so to do, within one year after the ratification of this treaty, or sooner, if the means are furnished them. In the mean time it shall be lawful for them to reside upon any land not in the actual claim and occupation of citizens of the United States, and upon any land claimed or occupied, if with the permission of the owner.

**Rights and privileges secured to Indians.**

ARTICLE 4. The right of taking fish and of whaling or sealing at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the United States, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands: *Provided, however,* That they shall not take shell-fish from any beds staked or cultivated by citizens.

**Proviso.**

**Payments by the United States.**

ARTICLE 5. In consideration of the above cession the United States agree to pay to the said tribe the sum of thirty thousand dollars, in the following manner, that is to say: During the first year after the ratification hereof, three thousand dollars; for the next two years, twenty-

five hundred dollars each year; for the next three years, two thousand dollars each year; for the next four years, one thousand five hundred dollars each year; and for the next ten years, one thousand dollars each year; all which said sums of money shall be applied to the use and benefit of said Indians, under the direction of the President of the United States, who may from time to time determine at his discretion upon what beneficial objects to expend the same. And the superintendent of Indian affairs, or other proper officer, shall each year inform the President of the wishes of said Indians in respect thereto.

*How to be applied.*

ARTICLE 6. To enable the said Indians to remove to and settle upon their aforesaid reservation, and to clear, fence, and break up a sufficient quantity of land for cultivation, the United States further agree to pay the sum of three thousand dollars, to be laid out and expended under the direction of the President, and in such manner as he shall approve. And any substantial improvements heretofore made by any individual Indian, and which he may be compelled to abandon in consequence of this treaty, shall be valued under the direction of the President and payment made therefor accordingly.

*Appropriation for removal and for clearing and fencing land, etc.*

ARTICLE 7. The President may hereafter, when in his opinion the interests of the Territory shall require, and the welfare of said Indians be promoted thereby, remove them from said reservation to such suitable place or places within said Territory as he may deem fit, on remunerating them for their improvements and the expenses of their removal, or may consolidate them with other friendly tribes or bands; and he may further, at his discretion, cause the whole, or any portion of the lands hereby reserved, or such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate thereon as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be practicable.

*Indians may be removed from the reservation.*

*Tribes may be consolidated.*

*Ante, p. 612.*

ARTICLE 8. The annuities of the aforesaid tribe shall not be taken to pay the debts of individuals.

*Annuities of tribe not to pay individual debts.*

ARTICLE 9. The said Indians acknowledge their dependence on the Government of the United States, and promise to be friendly with all citizens thereof, and they pledge themselves to commit no depredations on the property of such citizens. And should any one or more of them violate this pledge, and the fact be satisfactorily proven before the agent, the property taken shall be returned, or in default thereof, or if injured or destroyed, compensation may be made by the Government out of their annuities. Nor will they make war on any other tribe except in self-defence, but will submit all matters of difference between them and other Indians to the Government of the United States or its agent for decision and abide thereby. And if any of the said Indians commit any depredations on any other Indians within the Territory, the same rule shall prevail as that prescribed in this article in case of depredations against citizens. And the said tribe agrees not to shelter or conceal offenders against the United States, but to deliver up the same for trial by the authorities.

*Indians to preserve friendly relations.*

*To pay for depredations.*

*Not to make war, except.*

*To surrender offenders.*

ARTICLE 10. The above tribe is desirous to exclude from its reservation the use of ardent spirits, and to prevent its people from drinking the same, and therefore it is provided that any Indian belonging thereto who shall be guilty of bringing liquor into said reservation, or who drinks liquor, may have his or her proportion of the annuities withheld from him or her for such time as the President may determine.

*Annuities to be withheld from those drinking ardent spirits.*

ARTICLE 11. The United States further agree to establish at the general agency for the district of Puget's Sound, within one year from the ratification hereof, and to support for the period of twenty years, an agricultural and industrial school, to be free to children of the said tribe in common with those of the other tribes of said district and to

*United States to establish an agricultural, etc., school for the Indians; to provide tools and employ mechanics, etc.*

provide a smithy and carpenter's shop, and furnish them with the necessary tools and employ a blacksmith, carpenter and farmer for the like term to instruct the Iindians in their respective occupations. *Provided, however*, That should it be deemed expedient a separate school may be established for the benefit of said tribe and such others as may be associated with it, and the like persons employed for the same purposes at some other suitable place. And the United States further agree to employ a physician to reside at the said central agency, or at such other school should one be established, who shall furnish medicine and advice to the sick, and shall vaccinate them; the expenses of the said school, shops, persons employed, and medical attendance to be defrayed by the United States and not deducted from the annuities.

*A physician, etc.*

ARTICLE 12. The said tribe agrees to free all slaves now held by its people, and not to purchase or acquire others hereafter.

*The tribe is to free all slaves and not to acquire others.*

ARTICLE 13. The said tribe finally agrees not to trade at Vancouver's Island or elsewhere out of the dominions of the United States, nor shall foreign Indians be permitted to reside in its reservation without consent of the superintendent or agent.

*Not to trade out of the United States.*
*Foreign Indians not to reside on the reservation.*

ARTICLE 14. This treaty shall be obligatory on the contracting parties as soon as the same shall be ratified by the President of the United States.

*When treaty to take effect.*

In testimony whereof, the said Isaac I. Stevens, governor and superintendent of Indian affairs, and the undersigned, chiefs, headmen and delegates of the tribe aforesaid have hereunto set their hands and seals at the place and on the day and year hereinbefore written.

Isaac I. Stevens, governor and superintendent. [L. S.]

Tse-kauwtl, head chief of the Makah tribe, his x mark. [L. S.]
Kal-chote, subchief of the Makahs, his x mark. [L. S.]
Tah-a-howtl, subchief of the Makahs, his x mark. [L. S.]
Kah-bach-sat, subchief of the Makahs, his x mark. [L. S.]
Kets-kus-sum, subchief of the Makahs, his x mark. [L. S.]
Haatse, subchief of the Makahs, his x mark. [L. S.]
Keh-chook, subchief of the Makahs, his x mark. [L. S.]
It-an-da-ha, subchief of the Makahs, his x mark. [L. S.]
Klah-pe-an-hie, or Andrew Jackson, subchief of the Makahs, his x mark. [L. S.]
Tsal-ab-oos, or Peter, Neah village, his x mark. [L. S.]
Tahola, Neah village, his x mark. [L. S.]
Kleht-li-quat-stl, Waatch village, his x mark. [L. S.]
Too-whaii-tan, Waatch village, his x mark. [L. S.]
Tahts-kin, Neah village, his x mark. [L. S.]
Nenchoop, Neah village, his x mark. [L. S.]
Ah-de-ak-too-ah, Osett village, his x mark. [L. S.]
William, Neah village, his x mark. [L. S.]
Wak-kep-tup, Waatch village, his x mark. [L. S.]
Klaht-te-di-yuke, Waatch village, his x mark. [L. S.]
Oobick, Waatch village, his x mark. [L. S.]
Bich-took, Waatch village, his x mark. [L. S.]

Baht-se-ditl, Neah village, his x mark. [L. S.]
Wack-shie, Neah village, his x mark. [L. S.]
Hah-yo-hwa, Waatch village, his x mark. [L. S.]
Daht-leek, or Mines, Osett village, his x mark. [L. S.]
Pah-hat, Neah village, his x mark. [L. S.]
Pai-yeh, Osett village, his x mark. [L. S.]
Tsah-weh-sup, Neah village, his x mark. [L. S.]
Al-is-kah, Osett village, his x mark. [L. S.]
Kwe-tow'tl, Neah village, his x mark. [L. S.]
Kaht-saht-wha, Neah village, his x mark. [L. S.]
Tchoo-quut-lah, or Yes Sir, Neah village, his x mark. [L. S.]
Klatts-ow-sehp, Neah village, his x mark. [L. S.]
Kai-kl-chis-sum, Neah village, his x mark. [L. S.]
Kah-kwt-lit-ha, Waatch village, his x mark. [L. S.]
He-dah-titl, Neah village, his x mark. [L. S.]
Sah-dit-le-uad, Waatch village, his x mark. [L. S.]
Klah-ku-pihl, Tsoo-yess village, his x mark. [L. S.]
Billuk-whtl, Tsoo-yess village, his x mark. [L. S.]
Kwah-too-qualh, Tsoo-yess village, his x mark. [L. S.]
Yooch-boott, Tsoo-yess village, his x mark. [L. S.]
Swell, or Jeff. Davis. Neah village, his x mark. [L. S.]

Executed in the presence of us. The words "five hundred" being first interlined in the 5th article, and erasures made in the 8th and 9th articles.

M. T. Simmons, Indian agent.
George Gibbs, secretary.
B. F. Shaw, interpreter.
C. M. Hitchcock, M. D.
E. S. Fowler.
Orrington Cushman.
Robt. Davis.

---

## TREATY WITH THE CHIPPEWA, 1855.

*Articles of agreement and convention made and concluded at the city of Washington, this twenty-second day of February, one thousand eight hundred and fifty-five, by George W. Manypenny, commissioner, on the part of the United States, and the following-named chiefs and delegates, representing the Mississippi bands of Chippewa Indians, viz: Pug-o-na-ke-shick, or Hole-in-the-day; Que-we-sans-ish, or Bad Boy; Wand-e-kaw, or Little Hill; I-awe-showe-we-ke-shig, or Crossing Sky; Petud-dunce, or Rat's Liver; Mun-o-min-e-kay-shein, or Rice-Maker; Mah-yah-ge-way-we-durg, or the Chorister; Kay-qwa-daush, or the Attempter; Caw-caug-e-we-goon, or Crow Feather; and Show-baush-king, or He that passes under Everything, and the following-named chiefs and delegates representing the Pillager and Lake Winnibigoshish bands of Chippewa Indians, viz: Aish-ke-bug-e-koshe, or Flat Mouth; Be-sheck-kee, or Buffalo; Nay-bun-a-caush, or Young Man's Son; Maug-e-gaw-bow, or Stepping Ahead; Mi-gi-si, or Eagle, and Kaw-be-mub-bee, or North Star, they being thereto duly authorized by the said bands of Indians respectively.*

Feb. 22, 1855.

10 Stat., 1165.
Ratified Mar. 3, 1855.
Proclaimed Apr. 7, 1855.

ARTICLE 1. The Mississippi, Pillager, and Lake Winnibigoshish bands of Chippewa Indians hereby cede, sell, and convey to the United States all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, and included within the following boundaries, viz: Beginning at a point where the east branch of Snake River crosses the southern boundary-line of the Chippewa country, east of the Mississippi River, as established by the treaty of July twenty-ninth, one thousand eight hundred and thirty-seven, running thence, up the said branch, to its source; thence, nearly north in a straight line, to the mouth of East Savannah River; thence, up the St. Louis River, to the mouth of East Swan River; thence, up said river, to its source; thence, in a straight line, to the most westwardly bend of Vermillion River; thence, northwestwardly, in a straight line, to the first and most considerable bend in the Big Fork River; thence, down said river, to its mouth; thence, down Rainy Lake River, to the mouth of Black River; thence, up that river, to its source; thence, in a straight line, to the northern extremity of Turtle Lake; thence, in a straight line, to the mouth of Wild Rice River; thence, up Red River of the North, to the mouth of Buffalo River; thence, in a straight line, to the southwestern extremity of Otter-Tail Lake; thence, through said lake, to the source of Leaf River; thence down said river, to its junction with Crow Wing River; thence down Crow Wing River, to its junction with the Mississippi River; thence to the commencement on said river of the southern boundary-line of the Chippewa country, as established by the treaty of July twenty-ninth, one thousand eight hundred and thirty-seven; and thence, along said line, to the place of beginning. And the said Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and

Cession to the United States.